REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2465

September Term, 2015

---

CASEY O. JOHNSON

v.

STATE OF MARYLAND

---

Woodward,
Arthur,
Leahy,

JJ.

---

Opinion by Leahy, J.

---

Filed: March 29, 2017

"If you don't have time to do it right, when will you have time to do it over?"

John Wooden, UCLA Head Coach (1948-1975)

On a snowy evening in January, 2015, a Montgomery County Police Officer became suspicious that criminal activity may be afoot after he stopped Casey O. Johnson ("Appellant" or "Johnson") for a broken tail light in Germantown, Maryland. After more officers and a K-9 unit arrived at the scene, Johnson and her two passengers were asked to exit the vehicle. The police searched Johnson's two jacket pockets and found nothing, but when they searched Anthony Haqq, the front passenger, they found a baggie of 13 grams of marijuana in his waistband and smelled PCP on his breath. As they arrested the front passenger, the police proceeded to search Johnson's entire vehicle, including the trunk, while the K-9 stood idly by. A digital scale and 104.72 grams of marijuana were found inside a paper bag inside a backpack that was inside the trunk. Then the officers arrested Johnson, and during the search incident, found $544.00 on her person.

A grand jury charged Johnson with possession of marijuana with intent to distribute and conspiracy possession of marijuana with intent to distribute. Prior to trial in the Circuit Court for Montgomery County, Johnson moved to suppress all evidence seized by the police, who she claimed, violated the protection afforded her under the Fourth Amendment to the United States Constitution against unreasonable searches and seizures. The circuit court denied Johnson's motion, and the case proceeded to trial. The jury found Johnson guilty of possession of marijuana with intent to distribute, and the court sentenced Johnson to five years suspended in favor of supervised probation.

1

On appeal, Johnson presents two issues for our review:

1. "Did the police have reasonable articulable suspicion to continue detaining Ms. Johnson after a reasonable amount of time to process a traffic stop had passed?"

2. "Did the police have probable cause to search Ms. Johnson's trunk based on drug evidence found on the person of her front-seat passenger?"

Johnson's questions confine our review to the facts and argument presented before the suppression court. *See Longshore v. State*, 399 Md. 486, 498–99 (2007); *Ferris v. State* 355 Md. 356, 368 (1999). Because the officers lacked probable cause to believe that drugs were in the trunk based solely on the drugs found in the waistband and on the breath of the front passenger, we hold that the suppression court erred by concluding the officers were permitted to conduct a warrantless search of the trunk pursuant to the *Carroll* Doctrine. *See Carroll v. United States*, 267 U.S. 132 (1925); *see also California v. Acevedo*, 500 U.S. 565, 580 (1999); *United States v. Ross*, 456 U.S. 798 (1982); *Wilson v. State*, 174 Md. App. 434 (2007). Given our disposition of this issue, we need not address Johnson's first question.

## BACKGROUND

### Suppression Hearing

The circuit court held a hearing on Johnson's motion to suppress on April 16, 2015. Because the State tried Johnson and her front-seat passenger, Haqq, together, the suppression court heard arguments from both defendants on their pending motions. Johnson claimed the officers lacked reasonable articulable suspicion to prolong the stop past the purpose of writing a citation for the traffic law violation and that the officers

2

lacked probable cause to search the trunk of Johnson's vehicle. Officers Robert Sheehan and Michael Mancuso testified for the State, and Haqq testified for the defense. The following facts were established at the suppression hearing from these witnesses, and from Officer Sheehan's dashboard camera video of the traffic stop, which was played during his testimony.

## The Stop

The defective tail light on Johnson's car was apparent on the video of the stop that occurred at 7:25 p.m. on January 9, 2015 near the intersection of Middlebrook Road and Germantown Road in Germantown. Johnson had two passengers with her: Anthony Haqq[1] in the front seat and Kevin Helms[2] in the back seat.

At the time of the stop, Officer Sheehan was assigned to the Germantown District Community Action Team, a unit placed "in areas of high crime for crime suppression." He had served as a police officer for twelve years, including approximately one year on the Special Investigations Criminal Street Gang Unit, and approximately one year on the Special Investigations Narcotics Enforcement Team. Officer Sheehan also took several classes concentrating on drug interdiction, and completed 417 hours of training on drug interdiction. He testified that the stop occurred in a high-crime area.

---

[1] Haqq testified that Johnson was his girlfriend. This information was not known to the officers at the time of the traffic stop, however. Johnson had identified her passengers to Officer Sheehan as "friends" whom she had only known "about a month."

[2] The record does not contain information on whether Kevin Helms was charged in relation to this incident.

3

Officer Sheehan explained that he initiated the traffic stop to issue the driver a safety equipment repair order. When he activated his emergency equipment, Johnson drove "very slowly," turned into a Safeway parking lot, and stopped in the second parking aisle.[3] It had been snowing and was dark out, so Officer Sheehan shined a spotlight on the rear window of Johnson's vehicle.

**Furtive Movements and Nervousness**

Officer Sheehan perceived, through the rear window of the vehicle, Johnson and the front-seat passenger, Haqq, making "furtive movements." Specifically, he observed:

> It looked like [Johnson] may have been manipulating something in the center console area. She was bent over it. I could see her hand, her left hand on the steering wheel as she bent over the center console area, reaching in that area and reaching over towards Haqq's seat. . . . I could see her, portion from her elbow up moving, and I could see her shoulder. I couldn't see her arm. I'm sorry. Her hand.

> \* \* \*

> [Haqq] was moving around in his seat. He appeared to be either reaching under his seat on to the floorboard in front of his seat, and occasionally would lift his rear end up off the seat and then bring it back down, as if he was either trying to reach underneath where he was sitting, or the seat or the floorboard.

Haqq contested Officer Sheehan's observations and testified that neither he nor Johnson were moving around in their seats.

Officer Sheehan related that, after observing the furtive movements, the first thought that came to his mind was that the vehicle's occupants were trying to conceal

---

[3] After viewing the video of the traffic stop, the suppression court found that Johnson pulled over twenty-five seconds after Officer Sheehan initiated the stop, at 7:25:45. p.m.

drugs or weapons. So at 7:25:50 p.m. he "jump[ed] out of [his] car real quick to [go] up to the vehicle to see what was going on." Shining his flashlight into the vehicle as he approached, he observed Haqq "leaned over his own legs" and that "his hands were in between his legs." According to Officer Sheehan, when he got to the driver's window and introduced himself, Haqq "immediately jumped back in his seat . . . and pulled his shirt down over his crotch area." Johnson's "voice was shaking[,]" and Officer Sheehan observed "the carotid pulse in her neck [was] beating rapidly[.]"

Officer Sheehan attested that in his twelve years of experience conducting traffic stops, he developed a sense for "traffic stop nervous," which he described as "a normal baseline for a person that I just stopped for a regular violation." Johnson, however, was "extremely nervous" according to Officer Sheehan, who described Johnson's "trembling" hands "fumbl[e] through her wallet for her license . . . ." From these observations, Johnson appeared to Officer Sheehan more nervous than "traffic stop nervous."

Johnson asked Haqq for help locating the vehicle's registration in the glove box, but "he didn't move" and instead sat "like a statue" staring out the window. Haqq's brief testimony during the hearing that he "just sat in [his] seat and stared out the window" was consistent with Officer Sheehan's version of the events.

Upon returning to his patrol car at 7:26:27 p.m., Officer Sheehan called in to request that his Germantown District Community Action Team members assist him with the stop. Immediately thereafter, he began processing the traffic stop on "eTix," and

5

conducting the routine license, registration, and warrant checks in four systems.[4]  While conducting these checks he observed Haqq resume making furtive movements. Specifically, Officer Sheehan testified that "[a]s I am working on the computer, I can see now that Mr. Haqq is no longer statue-esque [sic] and not moving" but rather, "I could see . . . the top of [Haqq's] body moving back and forth . . . lifting up off his seat and leaning back a little bit" and "his arms moving in front on him."  At the point on the video corresponding to Officer Sheehan's testimony, a voice is heard on the video informing Officer Sheehan that "NICIC clear. 2009 Mitsubishi 4-door. License status, valid.  Points zero. NCIC person clear."[5]

Just after Officer Sheehan received the information on the background checks, Officer Dos Santos arrived at the stop at 7:29:30 p.m.   Officer Sheehan brought Officer Dos Santos up to date, explained that he had already requested a K-9 unit, and recommended that they wait for another member of the team to arrive for "officer safety reasons" before approaching the vehicle again because there were three occupants in the car.  At 7:32 p.m. Officer Mancuso arrived, and after Officer Sheehan summarized his observations, the three officers approached Johnson's car.

---

[4] Officer Sheehan conducted the routine checks through NCIC, E-Justice, Maryland Judiciary Case Search, and LInX.

[5] Johnson's counsel then asked the court to rule on whether the officers had developed reasonable articulable suspicion to lawfully continue the traffic stop. The suppression court declined to rule at that time.

**The Frisk and Search Incident**

Officer Sheehan asked Johnson to step out of the car so that he could show her the broken brake light and ask her a few questions. The video displayed the following exchange beginning at 7:32:44 p.m.:

| | |
|---|---|
| Officer Sheehan: | Who are these people in the car with you? |
| Ms. Johnson: | Oh. My friends. |
| Officer Sheehan: | Friends? Where are y'all coming from? |
| Ms. Johnson: | Coming from right over here. |
| Officer Sheehan: | Okay. And then stopping you, I could see a lot of movement in the car, all right? |
| Ms. Johnson: | Oh. Okay. |
| Officer Sheehan: | Okay? You were moving around a lot, he was moving around an awful lot, front passenger, and I couldn't see him because of the salt on the window. |
| Ms. Johnson: | Oh. Okay. |
| Officer Sheehan: | What were you guys doing? |
| Ms. Johnson: | Oh, nothing. I was just, I mean, moving around, because I don't understand. I was just (unintelligible), I wasn't doing anything. |
| Officer Sheehan: | Okay. All right. Is anything illegal in the car that I need to know about? No drugs? |
| Ms. Johnson: | No. |
| Officer Sheehan: | No weapons? |
| Ms. Johnson: | No, sir. |
| Officer Sheehan: | Okay. Where do these guys live? Do they live |

7

in the area?

Ms. Johnson: Yeah.

Officer Sheehan: Okay. How long have you known them for?

Ms. Johnson: I don't know. You know, about a month?

Officer Sheehan: Do you know if they have anything illegal on them?

Ms. Johnson: No. No sir.

Officer Sheehan: Okay. Nothing illegal in the car.

Ms. Johnson: No.

Officer Sheehan: Can I search your vehicle to make sure there's nothing illegal inside there?

Ms. Johnson: I'm not understanding why you need to?

Officer Sheehan: I just explained why. Because after I stopped you, you guys were moving around an awful lot.

Ms. Johnson: I understand that, I'm just saying that, to me, I'm not understanding why you have to search the car?

Officer Sheehan: I don't have to. I'm just asking consent.

Ms. Johnson: Yeah. I just don't think that that's appropriate, but –

Officer Sheehan: Okay. So, you don't want me to.

Ms. Johnson: I mean, I mean, I don't – no. Because I don't understand why you need to.

Officer Sheehan: Okay. That's fine. I've talked to you, I just thought that I might (unintelligible) them too.

Ms. Johnson: Yeah, I mean. I mean. No.

8

As the quoted exchange demonstrates, Johnson denied Officer Sheehan consent to search her vehicle. But soon after, she did consent to Officer Sheehan's request to search the outer two pockets of her sweatshirt. That search did not reveal any contraband or weapons. Officer Sheehan's exchange with Johnson concluded at 7:35:16 p.m.[6]

Meanwhile, Officer Mancuso had retrieved Haqq's information, and Officer Dos Santos had retrieved Mr. Helms' information. Officer Mancuso remained standing next to Haqq's passenger window, while Officer Sheehan ran the passengers' checks. By 7:37:07 p.m. there were five officers on the scene—Officers Sheehan, Dos Santos, Mancuso, Stone, and Dzenkowski. Officer Sheehan testified that while he ran the background checks he also re-opened the e-ticket for the repair order for Johnson's broken brake light at 7:41 p.m.[7] By 7:42:39 p.m. Officer Sheehan completed the passengers' background checks, which revealed both passengers had "PWID [possession with intent to distribute] or distribution priors," and Haqq had "a couple of assault on law enforcements."

At 7:44:18 p.m. Officer Kelly—the sixth officer—arrived with a K-9. Officer Sheehan informed Johnson that a K-9 unit would conduct a scan of her vehicle. Officer

---

[6] At this point during Officer Sheehan's testimony, Johnson's counsel again requested the court rule on the motion to suppress, arguing that the officers did not have probable cause to believe criminal activity was afoot based on the exchange between Officer Sheehan and Johnson, to continue detaining Johnson and her passengers after 7:35 p.m. The suppression court declined again to rule at that time.

[7] Officer Sheehan's testimony is not exactly clear as to whether he actually issued the repair order at 7:41 p.m. or just opened it back up at that time. He did not give Johnson the order/citation until they got to the police station.

Mancuso testified that, at this point in the stop, he asked Haqq and Helms to exit the vehicle in accordance with the police department's policy. At 7:46 p.m., before the K-9 scan of the vehicle, Haqq exited the vehicle and, on his own initiative, turned around, placing his hands on the roof of the car, and spread his feet. Haqq testified that he did that because he was nervous. Officer Mancuso testified that he then asked Haqq whether he could conduct a search of his person, and that he smelled PCP on Haqq's breath when Haqq responded to his request. Haqq claimed Officer Mancuso did not ask him anything, but proceeded to search his pants area and shirt. The search revealed a baggie of 13.14 grams of marijuana in Haqq's waistband. Officer Mancuso testified that based on his training and experience, he knew the baggie contained over 10 grams of marijuana.[8]

Haqq was arrested. The officers then conducted a search of the entire vehicle, including the trunk. In the trunk they discovered a backpack, according to Officer Sheehan, who testified: "I opened up the backpack, and inside was . . . a large black shopping bag . . . inside, I could see orange peels, coffee grounds, a digital scale, and a large container of 4C Iced Tea Mix. When I opened up the container of 4C Iced Tea Mix, there was a gallon sized bag of marijuana inside of it." He related that the marijuana was found to weigh 104.72 grams. When the officers placed Johnson under arrest, Officer Dzenkowski searched Johnson and found $544.00 in cash "folded into

---

[8] In 2014, the Maryland General Assembly decriminalized the use and possession of less than 10 grams of marijuana, making it a civil offense subject to a fine. 2014 Md. Laws, ch. 158 (S.B. 364). The pertinent provisions are now codified at Maryland Code (2002, 2012 Repl. Vol., 2016 Supp.), Criminal Law Article ("CL"), §§ 5-601 and 5-601.1.

different bundles."

## Closing Arguments

During closing arguments, the State argued that *Whren v. United States*, 517 U.S. 806, 810 (1996), permits officers to conduct traffic stops with the dual purposes of issuing a citation for a traffic law violation and investigating a suspected crime and that the traffic stop can transmute into a *Terry* investigation of a suspected crime. The State contended that the officers did not unreasonably detain Johnson and Haqq because the traffic stop began at 7:25 p.m. and was ongoing through 7:32 p.m., at which point the officers had developed reasonable articulable suspicion to conduct an investigative stop when they learned that both passengers had "possession with intent to distribute priors."

According to the State, by 7:46 p.m., the officers had developed probable cause to conduct a warrantless search of the entire vehicle pursuant to the *Carroll* Doctrine after Officer Mancuso smelled PCP on Haqq's breath and performed a consent search revealing a baggie of 13.14 grams of marijuana in Haqq's waistband. The State confirmed that Officer Kelly did not conduct a K-9 scan of the vehicle because the marijuana found on Haqq "supplied the probable cause" to search the entire vehicle.

Johnson countered that the police detained her unlawfully beyond the time it took to effectuate the traffic stop—and that the furtive movements and Johnson and Haqq's degree of nervousness were insufficient to form reasonable suspicion for a second stop because police cannot rely on nervousness to form the requisite probable cause under *Whitehead v. State*, 116 Md. App. 497 (1997). Johnson urged the suppression court (as to the second and dispositive issue in this appeal) that there was no nexus between the

11

marijuana found on Haqq and the marijuana and scale found inside the backpack that was in the trunk of the car. Johnson's counsel adopted the closing argument of Haqq's counsel, who asserted that there was "no independent probable cause for the officers to search the inside of the vehicle, let alone the trunk of the vehicle." "[M]arijuana found on a passenger is not enough to search a vehicle that he doesn't own, that he has not been driving." At best, counsel reasoned, the officers could have performed a *Gant* search,[9] which would have been limited to the passenger side of the vehicle where Haqq was sitting. Counsel maintained that the police could only perform a *Carroll* search if they had probable cause to believe *the vehicle* contained contraband.

## Suppression Ruling

After considering the parties' arguments, the suppression court reconvened on April 28, 2015 and, in denying Johnson's motion to suppress, made extensive findings of fact. The court began by observing that

> [u]pon stopping the vehicle the officer approached and asked for the driver's information. Thereafter the officer followed normal procedures associated with the routine stop for a broken taillight. Both before and while in the midst of these normal procedures the officer became suspicious of additional illegal activity and initiated further measures of investigation.
>
> The stop began at 7:25:45. We had the benefit of a video that, of the stop which had a time sequence reported and marijuana was taken from the front passenger, Mr. Haqq, at 7:46:45 just short of 21 minutes.

The court acknowledged that the determination of reasonable suspicion must be based on "common sense judgments and inference about human behavior," and credited

---

[9] *Arizona v. Gant,* 556 U.S. 332 (2009).

the experience and specialized training of the police officers. The court credited the other facts relied upon by the State, including that 1) the stop occurred in a high crime area, 2) the officer observed Johnson and Haqq's furtive movements, and 3) Haqq and Johnson showed an "unusual degree of nervousness."

The court concluded that the repair citation was completed at 7:41 p.m. (even though Officer Sheehan did not physically give the citation to Johnson at that time), "approximately 16 minutes after the stop[,]" and that during this time there was no unlawful detention "with all that was going on with regard to the warrant checks and with regard to the observations of the defendants by the police officer." The court next observed that a few minutes later the passengers were asked to exit the vehicle in accordance with police department policy for the purpose of conducting a canine search. The court found that Haqq consented freely to the search of his person:

> [Officer Mancuso] testified that upon defendant Haqq stepping outside the vehicle that the defendant immediately faced the car and put his hands up onto the vehicle's roof.
> The defendant admits he did this without officer direction . . . because he was nervous . . . . The officer then asked if he could search the defendant's person to which the defendant responded according to Officer Mancuso ['']go ahead.[']

The court also noted that Officer Mancuso smelled PCP on the breath of defendant Haqq when he had exited the vehicle.

The court rejected the defendants' arguments that, even if Haqq gave consent, that consent was not voluntary. The court stated its finding on the voluntariness of Haqq's consent:

> The Court finds that a reasonable person in this situation would have

13

felt free to decline the officer's request. The defendant's consent, defendant Haqq was not coerced or granted only in submission to a claim of lawful authority.

Significant to this finding is the fact that just minutes earlier defendant Johnson refused to consent to the search of the vehicle which lends credence to and support of the finding that the environment of the stop was not one in which the defendant's [sic] will were overborne.

The suppression court then turned to the issue of whether the officers had developed probable cause to conduct a search of the entire vehicle pursuant to the *Carroll* Doctrine. In denying the motion to suppress, the court announced its finding that the officers had probable cause to search the vehicle's trunk:

> Under [the *Carroll*] doctrine if a car is readily mobile[,] and probable cause exists to believe it contains contraband[,] the Fourth Amendment permits police to search the vehicle without warrant. . . .
>
> . . . Probable cause is a flexible common sense standard. It exists for a warrantless automobile search where facts and circumstances known to the police are such that it would warrant a man of reasonable caution to believe that the vehicle contained articles lawfully subject to seizure.
>
> A practical, nontechnical probability that incriminating evidence is involved is all that is required. . . .
>
> In this case[,] the police recovered a baggie of marijuana from defendant Haqq. The police . . . had testified there was a strong odor of PCP on his breath. These facts, in conjunction with the furtive behavior previously observed by the officer, the location of the stop, the evasive answers provided by the occupants and the extreme nervousness of both the front driver and the front passenger occupant were sufficient to establish probable cause to search the vehicle.

## Jury Trial

Johnson was tried on the charge for possession of marijuana with intent to distribute.[10] After a two-day jury trial, Johnson was found guilty on September 22, 2015.

---

[10] Johnson and Haqq were originally tried together in a jury trial on May 4-5, 2015. On May 5, 2015, the jury found Johnson not guilty of conspiracy to possess *Continued on next page . . .*

14

As mentioned *supra*, the trial court sentenced Johnson to five years of imprisonment suspended in favor of supervised probation on November 19, 2015. Johnson filed this appeal timely on December 17, 2015.

## DISCUSSION

The Supreme Court has made clear that when the police stop a motor vehicle and detain the occupant(s), the detention is a seizure that implicates the Fourth Amendment, *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* (citing *Prouse,* 440 U.S. at 653; *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)).

There is no dispute that the initial traffic stop in this case was valid. Officer Sheehan had probable cause to believe that Johnson violated a traffic law by driving with a broken tail light. Indeed, Johnson does not challenge the traffic stop itself; instead, in her first question on appeal she assails the constitutionality of the traffic stop's duration, and claims Officer Sheehan did not have reasonable articulable suspicion of criminal activity to conduct a *Terry* investigative stop after the traffic stop concluded. Because we

marijuana with intent to distribute. On May 6, 2015, Johnson filed a motion for mistrial on the possession of marijuana with intent to distribute charge, which the court granted. On the same day, May 6, 2015, Haqq was acquitted. After the mistrial, Johnson was tried alone and convicted as described above.

hold that the officers lacked probable cause to conduct a warrantless search of the trunk of Johnson's vehicle, the issue of whether Officer Sheehan developed reasonable articulable suspicion of criminal activity to conduct a *Terry* investigative stop is a constitutional question that is not necessary to decide today. *Curran v. Price*, 334 Md. 149, 171 (1994) ("We have long adhered to the policy of not deciding constitutional issues unnecessarily."). We therefore turn to the second issue presented by Johnson.

## I.

### A.     Standard of Review

The issue before us concerns the trial court's denial of Johnson's motion to suppress evidence; therefore, we view the facts presented at the suppression hearing in the light most favorable to the prevailing party—in this case, the State. *Sellman v. State*, 449 Md. 526, 531, 538 (2016); *see also Moats v. State*, 230 Md. App. 374, 384 (2016) (citation omitted), *cert. granted*, ___ Md. ___ (2017). We defer to the suppression court's factual findings and credibility determinations, and review those findings and determinations for clear error. *Williams v. State*, 372 Md. 386, 401 (2002).

Although we "'do not engage in *de novo* fact-finding[,]'" *Padilla v. State*, 180 Md. App. 210, 218 (2008) (quoting *Haley v. State,* 398 Md. 106, 131 (2007)), "[i]n determining whether a constitutional right has been violated, we make an independent, *de novo*, constitutional appraisal by applying the law to facts presented in a particular case." *Williams*, 372 Md. at 401 (citing *Wilkes v. State*, 364 Md. 554, 569; *Cartnail v. State*, 359 Md. 272 283–84 (2000)). In so doing, we note that the burden of justifying the search before the suppression court in this case was upon the State, for "once it is established . . .

16

that the search in issue was warrantless, a tectonic shift occurs in the allocation of the burdens. The respective roles of the State and of the defense are procedurally and dramatically reversed." *Epps v. State*, 193 Md. App. 687, 703 (2010). "'The very possibility of such a shift is a direct consequence of the Supreme Court's strong preference for searches and seizures pursuant to judicially approved warrants over warrantless searches and seizures.'" *Id.* at 704 (quoting *Herbert v. State,* 136 Md. App. 458, 485 (2001)).

### B.     The Search Exceeded the Scope Permitted Under the *Carroll* Doctrine

Before this Court, Johnson argues that the police did not have probable cause to search the trunk of her vehicle based on discovering marijuana in Haqq's waistband and smelling PCP on Haqq's breath.[11]  Johnson contends that police were required to have a "particularized and objective basis" to believe that Johnson granted Haqq access to her trunk before they could search the trunk without a warrant.  Furthermore, Johnson argues that searches under the *Carroll* Doctrine do not give police officers carte blanche to search the *entire* vehicle including the trunk.  Instead, Johnson contends that the

---

[11] Johnson does not have standing to challenge the search of Haqq and the seizure of the 13.14 gram bag of marijuana.  *Jones v. State*, 407 Md. 33, 49–50 (2008) (other citations omitted) (citing *Rakas v. Illinois*, 439 U.S. 128, 138 (1978) ("Fourth Amendment rights are personal in nature and may only be enforced by the person whose rights were infringed upon"); *see also Fitzgerald v. State*, 153 Md. App. 601, 659 (2003) ("If the defendant has no Fourth Amendment interest in the thing seized or the place searched, the defendant is barred, at the threshold, from raising the issue of the Fourth Amendment merits, whatever those merits might have been with respect to someone else." (citations omitted)).

"automobile exception" limits the scope of a warrantless search to specific places within a vehicle for which police officers have probable cause to search for the object of the suspected criminal activity. According to Johnson, Maryland courts have drawn a distinction between passengers and the driver: passengers, unless there is something indicating otherwise, do not have control over the contents of the vehicle.[12] Johnson points out that the officers only recovered evidence of drugs on the person of the front-seat passenger, Haqq, prior to their search of the trunk and there was no indication (or evidence) that Haqq may have placed drugs in the trunk of Johnson's vehicle. According to Johnson, neither Johnson's furtive movements reaching toward the center console, nor passenger Haqq's furtive movements pulling his shirt over his knees and

---

[12] Johnson relies on *State v. Wallace*, 372 Md. 137, 158–59 (2002) for this proposition. In *Wallace*, during a valid traffic stop, a canine made two positive alerts indicating that the vehicle may have contained contraband. *Id.* at 142. The officers proceeded to search each occupant of the vehicle and found cocaine in Wallace's pants—Wallace was a passenger. *Id.* at 143. After searching each occupant, the officers, then, conducted a search of the vehicle and found a large quantity of cash. *Id.* The State petitioned the Court of Appeals to determine whether the officers had probable cause to search Wallace—a passenger—solely based on the positive canine alert that drugs were located within the vehicle. *Id.* at 147. The Court noted that under Maryland law, there is a "distinction between drivers and owners and passengers of vehicles." *Id*. at 158-59. The Court held that "a positive canine alert to contraband in a vehicle, without more, does not establish probable cause to search all of the passengers in the vehicle." *Id.* at 141, 159. This Court had called *Wallace* into doubt because of its reliance on *Pringle v. State*, 370 Md. 525 (2002), *rev'd sub nom. Maryland v. Pringle*, 540 U.S. 366 (2003). *See Stokeling v. State*, 189 Md. App. 653, 674 n.9 (2009) ("The continued vitality of *Wallace* is questionable given the Supreme Court's ultimate decision in *Pringle*."). But in *Norman v. State*, the Court of Appeals dispelled any doubts about *Wallace* by declaring, "*Wallace* remains good law, and has not been vitiated by *Pringle*[,]" adding that "[w]e disagree with the Court of Special Appeals's remark in *Stokeling*, that *Pringle* casts doubt on *Wallace's* status as good law." ___ Md. ___, ___, No. 56, September Term 2016, slip op. at 41, 43 (filed Mar. 27, 2017) (plurality opinion) (internal citations omitted).

18

reaching toward the floor, could supply the probable cause required for a lawful search of the trunk. Johnson revisits Officer Sheehan's testimony that Haqq "might have shoved something under his seat," and concedes, at most, the facts available to police at the time were that drugs may have been placed by Haqq in the front-passenger side of the car.

Conversely, the State contends the police are not required to have a "particularized basis" to search specific areas of a vehicle where there is probable cause to believe that evidence of a crime is within the vehicle. The State relies on *Acevedo*, *Ross*, and *Wilson*, *supra*, for the proposition that because the police recovered marijuana from Haqq during a consent search and further smelled PCP on his breath, the "probable cause to search Johnson's car for drugs or paraphernalia extended to every part of the car in which such items could be concealed[,]" including the trunk. Citing *Wyoming v. Houghton*, 526 U.S. 295 (1999), the State rejects Johnson's contention that we should differentiate between drivers and passengers in determining whether the police developed probable cause, and presses that Johnson's nervousness and furtive movements proved she was aware Haqq had contraband in his possession.

We have not had occasion to examine whether the police may have probable cause to search the trunk of a vehicle without a warrant under the *Carroll* Doctrine based solely on finding drugs on the person of a passenger. We begin our analysis with the ascendant constitutional framework.

## 1. The Requirements and Scope of Searches Pursuant to the *Carroll* Doctrine.

The Reasonableness Clause of the Fourth Amendment provides "[t]he right of the

19

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  Surveying federal constitutional law, we explained in *State v. Andrews*, that "[t]he Fourth Amendment protects not against all intrusions as such, 'but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'"  227 Md. App. 350, 373–74 (2016) (quoting *Maryland v. King*, ___ U.S. ___, ___, 133 S.Ct. 1958, 1969 (2013)).  As such, the Fourth Amendment mandates that searches and seizures be reasonable, but "*what is reasonable depends on the context within which a search takes place.*"  *Id.* (citing *State v. Alexander*, 124 Md. App. 258, 265 (1998)) (emphasis added in *Alexander*).  Reasonableness "generally requires the obtaining of a judicial warrant[,]" *Riley v. California* 134 S.Ct. 2473, 2482 (2014), for it is an established principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

The National Prohibition Act drove the Supreme Court's first significant articulation of the "automobile exception" to the warrant requirement.  *Carroll*, 267 U.S. at 136.  We quote Chief Justice Taft's vivid rendition of the facts in *Carroll*:

> We know in this way that Grand Rapids is about 152 miles from Detroit, and that Detroit and its neighborhood along the Detroit river, which is the international boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. It is obvious from the evidence that the prohibition agents were engaged in a regular patrol along the important highways from Detroit to Grand Rapids to stop and seize liquor carried in automobiles. They knew or had

20

convincing evidence to make them believe that the Carroll boys, as they called them, were so-called 'bootleggers' in Grand Rapids; i.e., that they were engaged in plying the unlawful trade of selling such liquor in that city. The officers had soon after noted their going from Grand Rapids half way to Detroit, and attempted to follow them to that city to see where they went, but they escaped observation. Two months later these officers suddenly met the same men on their way westward presumably from Detroit. The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whisky to the officers, which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids, where they plied their trade. That the officers, when they saw the defendants, believed that they were carrying liquor, we can have no doubt, and we think it is equally clear that they had reasonable cause for thinking so.

*Id*. at 160. The Court held that where "the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid." *Id*. at 149. The Court underscored the difference between a search for contraband located in a premises such as a house, office, or building, versus the search of a movable vessel where the contraband "readily could be put out of reach of a search warrant." *Id*. at 151. The underlying rationale for the automobile exception to the warrant requirement, therefore, is that vehicles are inherently mobile, and by their very nature, create an exigency. *Id*. at 151; *see also Berry v. State*, 155 Md. App. 144, 178 (2004) (explaining that the automobile exception has no separate exigency requirement).

In *Carroll*, the Court did not address the scope of the search that is permissible, and it took many years before the Supreme Court re-examined the automobile exception

in 1982 in *Ross*, *supra*, 456 U.S. 798.[13]  The subsequent decisional detours under and around the *Carroll* doctrine are particularly instructive in considering the present case involving the search and arrest of a passenger, followed by the search of a vehicle.

Historically, the automobile exception was not so relevant where the occupant of a vehicle was arrested, because attendant to that arrest, police were permitted to search the entire vehicle.  *See United States v. Rabinowitz*, 339 U.S. 56 (1950), *overruled in part by Chimel v. California*, 395 U.S. 752 (1969)).   The automobile exception assumed greater prominence, however, after *Chimel* and *New York v. Belton*, 453 U.S. 454 (1981)—cases in which the Supreme Court limited significantly the breadth of a permissible search incident to arrest.[14]

---

[13] In the intervening years, the Supreme Court had created a container exception, *see United States v. Chadwick*, 433 U.S. 1 (1977), which was essentially applied as an exception within the automobile exception after the Court ruled in *Sanders* that closed containers found in motor vehicles cannot be searched without a warrant. *Arkansas v. Sanders*, 442 U.S. 753, 765–766 (1979).  The ensuing confusion between the *Carroll* and *Chadwick* principles provoked the Court, in 1999, to overrule *Sanders*, reasoning that "it is better to adopt one clear-cut rule to govern automobile searches and eliminate the warrant requirement for closed containers set forth in *Sanders*." *Acevedo*, *supra*, 500 U.S. at 579.

[14] On appeal Johnson does not argue, as before the suppression court, that, at most, the officers may have been able to conduct a *Gant* search limited to the passenger compartment.   In *Gant*, the Supreme Court further limited the rule established in *New York v. Belton,* 453 U.S. 454 (1981) allowing police to search the passenger compartment of a vehicle after the arrest of a recent occupant of the vehicle.  556 U.S. at 351.  The Court noted that:

> Although it appears that the State's reading of *Belton* has been widely taught in police academies and that law enforcement officers have relied on the rule in conducting vehicle searches during the past 28 years,[] many of these searches were not justified by the reasons underlying the *Chimel*

*Continued on next page . . .*

In *Ross*, the Supreme Court set out to address "the extent to which police officers—who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it—may conduct a probing search

> exception. Countless individuals guilty of nothing more serious than a traffic violation have had their constitutional right to the security of their private effects violated as a result.

*Id*. at 349. The *Gant* Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351. The Court further explained that when these justifications are absent, "a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Id.*

We note that Johnson's case illustrates how the reasonable articulable suspicion required as a basis for a *Gant* search and the probable cause required for a *Carroll* search are qualitatively different, and how the scope of the search permitted under each may contrast as well. The doctrines are separate and distinct exceptions to the Fourth Amendment warrant requirement. Clearly, given that reasonable articulable suspicion is a lesser standard than probable cause, *see Sellman, supra,* 449 Md. at 543, every warrantless search that intrudes into an automobile does not automatically become a distended *Carroll* search.

Although *Gant* was intended to clarify the scope of a search incident to arrest in the context of a motor vehicle search, as Judge Wilner recently noted in *Taylor v. State*, 448 Md. 242, 249 (2016), *cert. denied*, ___ U.S. ___ (2017), some confusion remains as to the precise meaning of the phrase "reasonable to believe" in its holding. *Gant*, 556 U.S. at 351. In *Taylor*, the police conducted a search incident to an arrest after arresting the petitioner for driving under the influence. 448 Md. at 245. The search uncovered cocaine in the passenger compartment, and the petitioner was convicted of driving under the influence and possession with the intent to distribute cocaine. *Id.* at 244–45. After reviewing the different interpretations among other jurisdictions, the Court of Appeals determined that "reasonable to believe" is "the equivalent of reasonable articulable suspicion." *Id.* at 250. And, accordingly, it held that the search of the passenger compartment incident to the arrest was permissible under *Gant* because the officers had reasonable articulable suspicion, based on prior experience with similar arrests, that evidence related to driving under the influence—open containers—might be found in Taylor's car. *Id.* at 250–51. Once again, neither Johnson nor the State advance an argument based on *Gant*.

23

of compartments and containers within the vehicle whose contents are not in plain view." 456 U.S. at 800. There, detectives had received a tip from a reliable informant that Ross was selling narcotics from the trunk of his car parked at a certain address. *Id.* The detectives drove immediately to that address to investigate. *Id.* After identifying the car, the detectives drove around the block to avoid alerting anyone of their presence. *Id.* Upon their return five minutes later, the detectives observed the same car turning on to another street. *Id.* at 801. The detectives confirmed the driver matched the informant's description of Ross, stopped the car, and asked Ross to exit the vehicle. *Id.* A bullet was discovered on the front seat and then a pistol was found in the glove compartment. *Id.* Ross was arrested. Then detectives proceeded to search the trunk of the car, finding a paper bag containing heroin and a leather pouch with $3,200.00 in cash. *Id.* After Ross was charged with possession of heroin with intent to distribute, he moved to suppress the heroin and money found in closed containers in the trunk. *Id.*

In holding that a warrant was not required to search both closed containers, the Supreme Court explained that the scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Id.* at 824. The Court reasoned:

> Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. **Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab.**

*Id.* (emphasis added).

24

Accordingly, "the scope of the warrantless search authorized by the [automobile] exception is no broader and no narrower than a magistrate could authorize legitimately by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825. The police were therefore permitted to search the closed containers—a paper bag and leather pouch—in the trunk without a search warrant because the officers had probable cause that contraband was concealed somewhere in the vehicle based on the reliable informant's tip that he had seen Ross sell narcotics from the trunk of his car and "heard [Ross] say he possessed additional narcotics." *Id.* at 817 n.22.

In 1991, the Supreme Court rejected the distinction made in earlier cases between an automobile and personal property that may be placed in an automobile and held that the reduced expectation of privacy in an automobile now applies to containers placed in vehicles. *Acevedo*, *supra,* 500 U.S. at 576. In *Acevedo*, a federal drug enforcement agent seized a package of marijuana sent via federal express, and arranged a sting operation with a police officer to arrest the individual who arrived to claim the package. *Id.* at 567. After Jamie Daza claimed the package, the officers followed him to his apartment. *Id.* The officers later observed Charles Acevedo enter Daza's apartment and leave with a paper bag similar in size to the marijuana package. *Id.* The officers then observed Acevedo put the bag in the trunk of his car and drive off. *Id.* Concerned that they would lose the evidence, the officers stopped Acevedo, opened the trunk, and found the bag of marijuana. *Id.* After Acevedo was charged with possession of marijuana for sale, he moved unsuccessfully to suppress the marijuana found in the trunk. *Id.* at 568. The state

25

intermediate appellate court reversed, concluding that the motion should have been granted. *Id.* The court reasoned that because "the officers had probable cause to believe that the paper bag contained drugs but lacked probable cause to suspect that Acevedo's car, itself, otherwise contained contraband," the officers needed a search warrant to open the paper bag. *Id.*

The Supreme Court granted certiorari to determine whether the officers required a warrant to search a closed container—the bag of marijuana found in the trunk—when the officers had probable cause to believe that the bag contained drugs but lacked probable cause to search the entire vehicle. *Id.* at 573. Thus, the distinction between *Ross* and *Acevedo* was the probable cause; in *Ross* officers had probable cause to believe that contraband was somewhere in the vehicle whereas in *Acevedo* officers had probable cause to believe that contraband was in the container in the trunk. The Court noted that, in *Ross*, the Court had already recognized that "'prohibiting police from opening immediately a container in which the object of the search is most likely to be found and instead forcing [the police] first to comb the entire vehicle would actually exacerbate the intrusion on privacy interests.'" *Id.* at 574 (quoting *Ross*, 456 U.S. at 821). The Court affirmed the interpretation of the *Carroll* doctrine set forth in *Ross*, and held the same principles apply to containers found in an automobile. *Id.* Justice Blackmun, writing for the majority in *Acevedo,* observed that the *Ross* Court

> went on to note: 'Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab.' [*Ross*, 456 U.S. at 824.] We reaffirm that principle. In the case before us, the police had probable cause to believe that the paper bag in the automobile's trunk contained marijuana. That probable cause now

26

allows a warrantless search of the paper bag. **The facts in the record reveal that the police did not have probable cause to believe that contraband was hidden in any other part of the automobile and a search of the entire vehicle would have been without probable cause and unreasonable under the Fourth Amendment.**

*Id*. at 580 (emphasis added).

Although, as we have already noted, there is no appellate decision in Maryland that has examined the precise question at issue in this appeal, in 2007 *Wilson*, *supra*, this Court had occasion to apply the *Carroll* Doctrine as defined by *Ross* and *Acevedo*. In that case, a police officer initiated a traffic stop upon observing Wilson exceed the posted speed limit. *Wilson*, 174 Md. App. at 438. As the officer asked Wilson for his driver's license and registration, he noticed the smell of burnt marijuana emanating from the vehicle. *Id.* The officer informed Wilson that he detected the odor and asked Wilson and his passenger to step out of the vehicle so he could search the vehicle. *Id.* The officer requested a K-9 drug detection unit, which did not arrive until after the officer concluded his search. *Id.* at 438–39. The officer did not find contraband in the passenger compartment of the vehicle but he found six and a half pounds of marijuana in the trunk. *Id.*

After surveying the decisions from numerous other jurisdictions that had addressed circumstances similar to those presented in *Wilson*, this Court concluded the warrantless search of the trunk was permissible under the *Carroll* Doctrine. *Id.* at 454. The Court noted that "the odor of burnt marijuana emanating from a vehicle provides probable cause to believe that additional marijuana is present elsewhere in the vehicle." *Id.* We held that the location-specific principle—that the search is limited to where

27

officers have probable cause to believe the item is located—"does not apply when officers have only probable cause to believe that contraband is located somewhere within the vehicle, rather than in a specific compartment or container within the vehicle." *Id.* In summary, "if officers have probable cause to believe that contraband is in only one part of a car, then they are limited to that area. If, on the other hand, officers have probable cause to believe that contraband is located somewhere in a car, but they don't know exactly where, then they can search the entire vehicle." *Id.* at 444–45 (quoting *United States v. Seals*, 987 F.2d 1102, 1107 n.8 (5th Cir. 1993)).

Turning to the case on appeal, we first note important factual distinctions from *Ross*, *Acevedo*, and *Wilson*. In each of those cases the officers had probable cause to suspect that drugs were located in the trunk based on an informant's tip—as in *Ross*—or by police observation—as in *Acevedo*—or, based on the odor of marijuana emanating from the vehicle, that drugs were "somewhere in the car"—as in *Wilson*. In this case, the police found a baggie of marijuana in a front passenger's waistline and smelled the odor of PCP on his breath after he stepped out of the vehicle. The police had already searched Johnson's pockets—the driver and owner of the vehicle—and found no contraband on her person. There was no indication that she had taken any illegal drugs, and certainly her nervousness could not, alone, establish reasonable suspicion, let alone probable cause, that she was transporting contraband in the trunk of her car. *See Ferris*, *supra,* 355 Md. at 389 (cautioning against placing too much reliance upon nervousness when analyzing a determination of reasonable suspicion). The information given to the police about the passenger, Haqq, was that he was a friend of Johnson's, whom she had known

28

only "about a month." There was no testimony or evidence presented to suggest that Haqq had any control over the vehicle, or would have had access to the trunk as say, if he was on a long road trip or in a common criminal enterprise with Johnson. Indeed, neither Officer Sheehan nor Officer Mancuso testified as to why they had probable cause to believe drugs were located in the trunk. Interestingly, this case presents circumstances that are exactly inverse to those presented in *Acevedo*—here the police had probable cause to believe that there were drugs in the passenger compartment of the vehicle, but not the trunk.

Applying the principles expressed in *Acevedo*, *Ross*, and *Wilson*, the permissible scope of the search in this case was defined by the object of the search: to find contraband that Haqq may have left or concealed within the vehicle. The police did not articulate a reasonable suspicion to believe that contraband was hidden in the trunk, or somewhere generally in the car,[15] or beyond the passenger compartment, and therefore,

---

[15] Recently, the Court of Appeals held that although the General Assembly had decriminalized the possession of less than 10 grams of marijuana, when the police detect the odor of marijuana emanating from a vehicle, they have probable cause to search the entire vehicle. *See Robinson v. State*, ___ Md. ___, ___, Nos. 37, 39 & 46, September Term 2016, slip op. at 33, 47 (filed Jan. 20, 2017). In *Norman*, *supra*, the Court considered a different issue: "whether a law enforcement officer who detects an odor of marijuana emanating from a vehicle with multiple occupants has reasonable articulable suspicion that the vehicle's occupants are armed and dangerous, and thus may frisk—*i.e.*, pat down—the vehicle's occupants for weapons." Slip op. at 1. The Court reversed the judgment of the circuit court denying Norman's motion to suppress and this Court's decision affirming, concluding that "there were insufficient circumstances giving rise to reasonable articulable suspicion that Norman was armed and dangerous to justify the frisk." *Id.*, slip op. at 57–58. A plurality joined in the precise holding that

*Continued on next page . . .*

the police lacked probable cause to support a warrantless search of Johnson's trunk.[16]

The State urges that *Wyoming v. Houghton*, *supra*, 526 U.S. 295, supports its argument that there is no longer a distinction between a driver and a passenger in determining the scope of the search of a vehicle under the *Carroll* doctrine. In *Houghton*, a police officer stopped a vehicle for exceeding the speed limit and driving with a broken brake light. 526 U.S. at 297. While questioning the driver, the officer

---

> where an odor of marijuana emanates from a vehicle with multiple occupants, a law enforcement officer may frisk, *i.e.*, pat down, an occupant of the vehicle if an additional circumstance or circumstances give rise to reasonable articulable suspicion that the occupant is armed and dangerous. Stated otherwise, for a law enforcement officer to have reasonable articulable suspicion to frisk one of multiple occupants of a vehicle from which an odor of marijuana is emanating, the totality of circumstances must indicate that the occupant in question is armed and dangerous. An odor of marijuana alone emanating from a vehicle with multiple occupants does not give rise to reasonable articulable suspicion that the vehicle's occupants are armed and dangerous and subject to frisk."

*Id.*, slip op. at 2.

[16] According to the State's representation at the hearing, upon finding the marijuana in Haqq's waistband, the officers chose not to conduct a K-9 scan of Johnson's vehicle—even though a K-9 unit was present—believing they had obtained sufficient probable cause to search the passenger compartment and the trunk immediately. A positive alert from a K-9 scan, however, may have provided the requisite probable cause to search the entire vehicle, including the trunk. *See Bowling v. State*, 227 Md. App. 460, 469 (2016) (citations omitted) ("With respect to the odor of marijuana, the Maryland appellate courts consistently have held that the detection of the odor of marijuana by a trained drug dog establishes probable cause to conduct a warrantless *Carroll* doctrine search of a vehicle."); *see also Wallace*, *supra*, 372 Md. at 146 (citing *Gadson v. State*, 341 Md. 1, 8 (1995); *In re Montrail M.*, 87 Md. App. 430 (1991) ("[T]he law is settled that when a properly trained canine alerts to a vehicle indicating the likelihood of contraband, sufficient probable cause exists to conduct a warrantless '*Carroll*' search of the vehicle.").

30

noticed a hypodermic syringe in the driver's shirt pocket. *Id.* at 298. After the driver admitted to using the syringe to take drugs, backup officers ordered the two passengers—one of whom was Sandra Houghton—out of the car so that they could search the passenger compartment for contraband. *Id.* In the backseat of the vehicle, the officer found Houghton's purse, proceeded to search it, and found drug paraphernalia and a syringe containing methamphetamine. *Id.* Houghton was subsequently charged with felony possession of methamphetamine and was convicted of that crime after the court denied her motion to suppress. *Id.*

In *Houghton*, it was uncontested that the police officers had probable cause to believe there were illegal drugs in the car and, therefore, could search the vehicle without a warrant pursuant to the *Carroll* doctrine. *Id*. at 300. The issue the Court addressed was whether a container (Houghton's purse) belonging to a passenger and left in the passenger compartment of a vehicle was lawfully within the scope of a *Carroll* search. *Id.* at 297. The Court declined to create an exemption to the *Carroll* Doctrine for a passenger's property, and, instead, held that police officers with probable cause to search a vehicle under the *Carroll* Doctrine may also search a passenger's purse capable of concealing the object of that search found in a vehicle. *Id.* at 307. "[N]either *Ross* itself nor the historical evidence it relied upon admits of a distinction among packages for containers based on ownership." *Id.* at 302.

The State reasons that because the *Houghton* Court refused to create a passenger-property exemption to the *Carroll* Doctrine, all passenger-driver distinctions are irrelevant under the *Carroll* Doctrine. Accordingly, the State maintains that the drugs

found in Haqq's waistband and the PCP odor on his breath were all the police needed to form the requisite probable cause to conduct a warrantless search of the entire car, including the trunk, for drugs and paraphernalia.

The State's reading of *Houghton* is a paralogism, for it ignores the point that once the *object* of the search establishes the proper *scope*, all areas and property within the scope may be searched. "'If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of that search.'" *Id.* at 301 (quoting *Ross*, 456 U.S. at 825). The *Houghton* Court reasoned that an exemption for property belonging to a passenger, "would dramatically reduce the ability to find and seize contraband and evidence of crime" because "one would expect passenger-confederates to claim everything as their own." *Id.* at 305–06. Nothing in *Houghton* suggests, however, that it is irrelevant whether the probable cause to search a vehicle or part of a vehicle is developed through interactions with the driver versus a passenger. We do not interpret the holding in *Houghton* as eliminating the distinction between passengers and drivers in Fourth Amendment jurisprudence.

## Conclusion

The factual circumstances surrounding the stop of Johnson's vehicle fell short of establishing probable cause that she was transporting contraband in the trunk of her car. Because the scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found," *Ross*, 456 U.S. at 799, before the police may conduct a warrantless search of the

trunk of a vehicle, the police must either have probable cause to believe drugs are in the car generally, or, as in this case, where the police find drugs on a passenger, they must articulate a particularized basis to search the trunk, such as the reasons for their belief that the passenger had access to the trunk.  Here, the officers lacked probable cause to believe that drugs were in the trunk based solely on the drugs found on the breath and in the waistband of the front-seat passenger.    Consequently, the suppression court concluded erroneously that the officers were permitted to search the trunk of the car under the *Carroll* Doctrine.

**JUDGMENT REVERSED.**
**COSTS TO BE PAID BY**
**MONTGOMERY COUNTY.**