*State of Maryland v. Casey O. Johnson*, No. 22, September Term, 2017

**CRIMINAL LAW — FOURTH AMENDMENT — PROBABLE CAUSE TO SEARCH TRUNK OF VEHICLE —** Law enforcement had probable cause to search the trunk of a car after a traffic stop was initiated in a high-crime area; the stopping officer was a twelve-year veteran with experience in drug interdiction; the driver and front-seat passenger were making simultaneous furtive movements throughout the stop; both gave evasive answers to questioning; both were extremely nervous during an otherwise routine traffic stop; two of the vehicle's three occupants had prior convictions related to drug distribution; and a consent search of the front-seat passenger revealed over thirteen grams of marijuana on his person and an odor of PCP on his breath.

IN THE COURT OF APPEALS
OF MARYLAND

No. 22

September Term, 2017

_____

STATE OF MARYLAND

v.

CASEY O. JOHNSON

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.
Adkins and Hotten, JJ., dissent.

_____

Filed:  April 20, 2018

We issued a writ of certiorari in this case to consider whether the police had probable cause to search the trunk of a car owned and driven by Ms. Casey O. Johnson, Respondent, based in part on drug evidence found on the person of her front-seat passenger. We hold, based on the facts found at the suppression hearing viewed in their totality, that there was probable cause to conduct the search. We therefore reverse the judgment of the Court of Special Appeals, which came to the opposite conclusion.

## I.

### The Suppression Hearing

Respondent and Anthony Haqq, her front-seat passenger, were charged with conspiracy to possess marijuana with intent to distribute and possession with intent to distribute. Both filed motions to suppress the evidence found by the police during an extended detention that had begun as a traffic stop. A joint hearing was conducted before the Circuit Court for Montgomery County on the co-defendants' respective motions to suppress. The following facts, either undisputed or expressly found by the suppression court, were drawn from witness testimony and the audio and video feed from a police vehicle's dashboard camera—colloquially referred to as a "dashcam"—which was played and admitted into evidence at the hearing. Montgomery County Police Officers Robert Sheehan and Michael Mancuso testified for the State, and Mr. Haqq testified for the defense. Respondent did not testify. The suppression court accepted the State's version of the events, as described by the two officers and supported by the dashcam recording.

At the time of the stop, Officer Sheehan was assigned to the Germantown District Community Action Team ("Community Action Team"), a unit assigned to high-crime

areas for crime suppression. He had served as a police officer for twelve years, including one year on the Special Investigations Criminal Street Gang Unit and one year on the Special Investigations Narcotics Enforcement Team. Officer Sheehan had taken several classes concentrating on drug interdiction, completing 417 hours of training on the subject.

Officer Sheehan testified that one evening in January 2015 he was patrolling a high-crime area of Germantown, Maryland. As he approached a red traffic light, Officer Sheehan pulled directly behind what later was determined to be a four-door Mitsubishi sedan owned and driven on that evening by Respondent. Officer Sheehan noticed that the car had a defective brake light. He activated his vehicle's emergency equipment, which triggered the video and audio recording via his vehicle's dashcam. The recording captured much of what ensued.

Officer Sheehan testified that he turned on the vehicle's spotlight and shined it through the rear window of Respondent's car. When the traffic light turned to green, Respondent drove through the intersection. Officer Sheehan followed and was able to see Respondent and a front-seat passenger, later identified as Mr. Haqq, through the rear window. Officer Sheehan was unable to discern at that time the presence of a third occupant of the car, Kevin Helms, who was seated in the backseat.[1]

Respondent continued to drive for twenty-five seconds before turning into a commercial parking lot, where she stopped. As he followed, Officer Sheehan could see with the aid of the spotlight that Respondent and Mr. Haqq were making "furtive

---

[1] The record does not reflect whether Mr. Helms was charged in relation to this incident.

movements." Officer Sheehan saw Respondent's left hand on the steering wheel as she reached over the center console with her right arm, "reaching in that area and reaching over towards Mr. Haqq's seat." Officer Sheehan testified that "[i]t looked like she may have been manipulating something in the center console area." He observed Mr. Haqq moving in his seat at the same time. On three or four occasions, Mr. Haqq "occasionally would lift his rear end up off the seat and then bring it back down, as if he was either trying to reach underneath where he was sitting, or the seat or the floorboard." Based on the above, together with his training and experience, Officer Sheehan's first thought was that Mr. Haqq and Respondent may be trying to conceal drugs or weapons.

Respondent pulled to a stop in a commercial parking lot. Officer Sheehan parked his vehicle behind Respondent's car and approached the driver's side window on foot. As he approached, he shined his flashlight into the car and observed Mr. Haqq leaning over his legs with his hands between them, but he could not see what Mr. Haqq was doing with his hands. When Officer Sheehan identified himself by name, Mr. Haqq "immediately jumped back in his seat . . . and pulled his shirt down over his crotch area." Respondent similarly "bounce[d] back like she was in the center console area" and said that she was "looking for [her] registration right now."

Respondent appeared "extremely nervous" despite the routine nature of the stop: her voice was shaking; her hands were trembling; and "the carotid pulse on her neck [was] beating quickly." She fumbled with her wallet for her license, flipping past it several times and having difficulty grasping her license because her hands were trembling. Her nervousness never subsided and was, in Officer Sheehan's estimation, beyond the "normal

3

baseline" level of nervousness that he had observed over his twelve years of law enforcement and "thousands of traffic stops." Throughout, Mr. Haqq sat "like a statue," staring out the window with his sweatshirt "pulled down over his crotch." He remained motionless in that position, even when Respondent asked him to help her retrieve the registration from the glove compartment.

Officer Sheehan testified that, based on those observations, he suspected that something "illegal" was "going on." He returned to his patrol vehicle with Respondent's license and registration and called in a request for assistance from his fellow members of the Community Action Team and a canine unit.

Then, while continuing to observe Respondent's car, Officer Sheehan "start[ed] processing the traffic stop." He accessed an electronic ticketing system, "eTix," and began to input Respondent's information. As part of his typical procedure during traffic stops, he also accessed several systems to conduct a "warrant check" on Respondent. While doing that, Officer Sheehan noticed that Mr. Haqq was no longer sitting "statue-esque" but, rather, was "moving back and forth," "lifting up off his seat and leaning back," and appearing to "reach[] around" the inside of the car.

Officer Dos Santos arrived on the scene while Officer Sheehan was processing Respondent's background checks. Officer Sheehan informed Officer Dos Santos of his observations, and it was agreed that they would await the arrival of a third member of the Community Action Team before retrieving further information from Respondent and the two passengers. Officer Mancuso arrived shortly thereafter.

Officer Sheehan informed Officer Mancuso of what he had discerned from his

4

observations of Respondent and Mr. Haqq. The three officers then approached Respondent's car. Officer Sheehan went to the driver's side window to speak with Respondent, Officer Dos Santos went to the rear seat on the driver's side of the car to speak with Mr. Helms, and Officer Mancuso went to the front passenger side to speak with Mr. Haqq.

Officers Dos Santos and Mancuso obtained identifying information from Messrs. Helms and Haqq as they remained seated in the car. While questioning Mr. Helms, Officer Dos Santos noticed that Mr. Helms was acting "kind of weird," "nervous, or just odd." Officer Mancuso asked Mr. Haqq general questions, but Mr. Haqq "didn't seem too eager to talk" and gave "one-word answers" to some of the questions. During questioning, Mr. Haqq also sat "extremely still in the passenger seat, staring straight ahead through the windshield."

As the other officers were questioning Messrs. Haqq and Helms, Officer Sheehan asked Respondent to step outside so he could show her the defective brake light and "ask her some qualifying questions." As he questioned her, Respondent began each answer with "uh or um," as if she was "trying to think up an answer." When asked who the passengers were, Respondent answered, "[m]y friends" who lived in the area. Officer Sheehan asked her how long she had known them, to which she responded, "I don't know. You know, about a month?" When asked from where they were coming, she answered only "from right over here."

Officer Sheehan then told Respondent that he had seen "a lot of movement in the car" and asked, "What were you guys doing?" Respondent replied, "Oh, nothing. I was

5

just, I mean, moving around, because I don't understand. I was just (unintelligible), I wasn't doing anything."[2] Respondent denied that there were drugs or weapons in the car. Officer Sheehan asked Respondent for her consent to search the car, which she declined. He then asked for consent to search her pockets, and she agreed. The search conducted at that time did not reveal any contraband. Then or shortly thereafter, Officer Dos Santos reported to Officer Sheehan that he heard Respondent say—though it is unclear to whom—that she was "picking up a friend" from a store. The record does not reflect precisely when that exchange occurred, but it appears from the dashcam audio that it likely occurred soon after Officer Dos Santos began questioning Mr. Helms and before Respondent stepped out of the car.

Officer Sheehan returned to his patrol car to check whether Messrs. Haqq and Helms had outstanding warrants. As he had done in running Respondent's warrant check, he ran Mr. Haqq's and Mr. Helms's information through NCIC, E-Justice, LInX, and Case Search. Officer Sheehan learned that both Mr. Haqq and Mr. Helms had prior convictions of possession with intent to distribute or distribution of a controlled dangerous substance and that Mr. Haqq had prior convictions of assault on law enforcement.

Shortly thereafter, Officer Kelly arrived with a canine. Officer Sheehan, who was with Respondent, noticed that, upon the arrival of the canine, "[Respondent] looked up" and then "put[] her head down." Officer Sheehan informed Respondent that the canine would conduct a scan of her vehicle and asked if there was any reason it might "hit" on her

---

[2] This dialogue between Officer Sheehan and Respondent was captured on the audio portion of the dashcam recording.

vehicle. She "wouldn't answer [him] at first," so Officer Sheehan asked a second time, to which Respondent said, "No." Officer Sheehan told Officer Kelly that, given Respondent's reaction to the arrival of the canine unit and her and Mr. Haqq's movements, he was "pretty sure" the dog would "hit" on the car.

In accordance with the police department's policy, Officer Mancuso directed the occupants to step out of the vehicle to allow the canine unit to conduct a vehicle scan. When Mr. Haqq exited, he, without request, "immediately turned around," raised his hands, and spread his feet. Mr. Haqq then consented to a search of his person. The search revealed a small bag containing 13.14 grams of marijuana in the waistband under Mr. Haqq's sweatshirt, and Officer Mancuso smelled PCP on Mr. Haqq's breath. Officer Mancuso then arrested Mr. Haqq.

The record does not reflect why the officers did not conduct the canine scan. Instead, they proceeded to search the passenger compartment, finding nothing of evidentiary value. The officers then conducted a search of the trunk, which revealed a backpack containing a large shopping bag. Inside the bag was a digital scale and a container holding a gallon-sized bag with 104.72 grams of marijuana. Respondent was arrested, and a further search of her person revealed $544.00 in U.S. currency.

At the conclusion of testimony, the court heard argument from the State and counsel for Mr. Haqq and Respondent. Respondent, through her counsel, incorporated Mr. Haqq's arguments and advanced two theories in support of suppression of the marijuana found in the trunk of her vehicle. She argued first that the police detained her without the requisite justification of reasonable suspicion of criminal activity beyond the point at which the

7

concededly lawful traffic stop should have concluded. Respondent further argued that, even if the superseding stop was supported by reasonable suspicion of criminal activity, the police did not possess probable cause to search the trunk. Respondent argued that, at most, the police could perform a search under *Arizona v. Gant*, 556 U.S. 332 (2009), limited to the passenger compartment where Mr. Haqq had been sitting and that there was no "nexus between the drugs found on Mr. Haqq and the trunk of the car[.]"

The suppression court took the matter under advisement and, at a subsequent hearing, made extensive findings of fact and ruled on the pending suppression motions of Respondent and Mr. Haqq. The court first addressed the total length of the detention and concluded that in the initial few minutes of the encounter before the traffic stop was concluded, the officers had developed reasonable suspicion to continue detaining Respondent and her passengers beyond the time that would otherwise be attributable to a routine traffic stop.

The court credited the experience, training, and testimony of the officers. The court found that the traffic stop occurred in a high-crime area, Respondent and Mr. Haqq made "furtive movements" before and during the stop, and both displayed an "unusual degree of nervousness" for a routine traffic stop. The court further found that Mr. Haqq displayed "exaggerated immobility" in Officer Sheehan's presence, given his refusal to respond to Respondent's request to retrieve her registration from the glove compartment and the manner he held his sweatshirt over his knees. The court determined that those circumstances viewed in their totality gave the officers reasonable suspicion that the individuals in the vehicle were involved in criminal activity, permitting the continued

8

detention.

The court further ruled, in light of the totality of the circumstances, that by the time the officers searched the trunk of Respondent's vehicle they had amassed probable cause, under *Carroll v. United States*, 267 U.S. 132 (1925), to believe the trunk contained evidence of drug-related activity. The court recounted the recovery of marijuana from Mr. Haqq, the "strong odor of PCP on his breath," the "furtive behavior" of both Respondent and Mr. Haqq, the location of the stop in a high-crime area, and the evasive answers and extreme nervousness of Respondent and Mr. Haqq. The court also concluded that it was "not unreasonable" for the officers to believe that "the possession of narcotics by a vehicle's passenger in conjunction with the evidence of recent use" indicates "current possession of unused narcotics somewhere else inside the vehicle, including the trunk."[3] Accordingly, the suppression court denied Respondent's and Mr. Haqq's motions to suppress.

## II.

### The Trial, Appeal, and Writ of Certiorari

Respondent and Mr. Haqq were tried jointly on charges of conspiracy to possess marijuana with intent to distribute and possession with intent to distribute. A jury found Respondent not guilty of conspiracy, and the court declared a mistrial as to possession with intent to distribute. Respondent was retried, and a jury found her guilty of possession with

---

[3] The court did not include in its analysis, although it certainly could have, that both Mr. Haqq and Mr. Helms had prior convictions of either possession with intent to distribute or distribution of controlled dangerous substances.

9

intent to distribute. Respondent was sentenced to five years' incarceration suspended to time served and placed on supervised probation for five years.

Respondent noted an appeal to the Court of Special Appeals, which reversed the judgment in a reported opinion. *Johnson v. State*, 232 Md. App. 241 (2017). Respondent presented two questions for that court's review. The first asked whether the police had reasonable suspicion to continue detaining Respondent after the initial traffic stop ended. *Id*. at 244. The second is the subject of this further appeal—whether the police had probable cause to search Respondent's trunk. *Id*.

The Court of Special Appeals addressed only the second question. Applying *Carroll* and its progeny, the intermediate appellate court reasoned that "the permissible scope of the search in this case was defined by the object of the search: to find contraband that Haqq may have left or concealed within the vehicle." *Johnson*, 232 Md. App. at 268 (citing *California v. Acevedo*, 500 U.S. 565 (1991); *United States v. Ross*, 456 U.S. 798 (1982); *Wilson v. State*, 174 Md. App. 434 (2007)). The Court of Special Appeals, focusing specifically on what the police found in searching Mr. Haqq, concluded that the scope of the search was limited to the passenger area of Respondent's vehicle because "the officers lacked probable cause to believe that drugs were in the trunk based *solely* on the drugs found in the waistband and on the breath of the front passenger." *Id*. at 244, 259, 271 (emphasis added).

The Court of Special Appeals premised its decision on the following facts: the police had already searched Respondent's pockets to no avail; nothing evinced that she had taken illegal drugs; and "certainly her nervousness could not, *alone*," establish probable

10

cause that she was transporting contraband in her trunk. *Id*. at 267 (emphasis added). The intermediate appellate court further reasoned that there was no evidence to suggest that Mr. Haqq had control over the vehicle "or would have had access to the trunk as say, if he was on a long road trip or in a common criminal enterprise with Johnson." *Id*. at 268. Rather, the intermediate appellate court evidently concluded that the only information known to the police was that Mr. Haqq was Respondent's friend whom she had known for only "about a month." *Id*. The Court of Special Appeals also considered that no officer had testified as to why there was probable cause to believe—or even reasonable suspicion— that there were additional drugs or contraband in Respondent's vehicle. *Id*. Given its disposition as to the search of the trunk of Respondent's vehicle, the Court of Special Appeals did not address the first question presented: whether the police had reasonable suspicion to continue detaining Respondent beyond the time that should have brought the traffic stop to an end. *Id*. at 244.

The State filed a petition for writ of certiorari on the question of whether the police lacked probable cause to search Respondent's trunk. We granted certiorari, *State v. Johnson*, 454 Md. 678 (2017). We now reverse the judgment of the Court of Special Appeals and remand the case to that court for it to decide the remaining Fourth Amendment issue not yet addressed by that court.[4]

**III.**

---

[4] Because the Court of Special Appeals opted not to address Respondent's claim of an unlawful superseding stop, that claim was left undecided. That claim, though, could not be, and was not, the subject of a petition for writ of certiorari and consequently is not before us.

11

**Standard of Review**

Appellate review of a motion to suppress is "limited to the record developed at the suppression hearing." *Moats v. State*, 455 Md. 682, 694 (2017). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion," here, the State. *Raynor v. State*, 440 Md. 71, 81 (2014). "We accept the suppression court's factual findings unless they are shown to be clearly erroneous." *Id.* We give "due weight to a trial court's finding that the officer was credible." *Ornelas v. United States*, 517 U.S. 690, 700 (1996). "[W]e review legal questions *de novo*, and where, as here, a party has raised a constitutional challenge to a search or seizure, we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *Grant v. State*, 449 Md. 1, 14–15 (2016) (quoting *State v. Wallace*, 372 Md. 137, 144 (2002)).

**IV.**

**Discussion**

A. *Overview*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Reasonableness within the meaning of the Fourth Amendment "generally requires the obtaining of a judicial warrant." *Id.* (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)).

12

Searches conducted without a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception, the scope and application of which is the subject of this appeal, is the "automobile exception" announced in *Carroll v. United States*, 267 U.S. 132 (1925). *Carroll* and its progeny authorize the warrantless search of a lawfully-stopped vehicle where there is probable cause to believe the vehicle contains contraband or evidence of a crime. *United States v. Ross*, 456 U.S. 798, 799 (1982); *Carroll*, 267 U.S. at 153.

The probable cause determination takes into account all the relevant circumstances leading up to the search, "viewed from the standpoint of an objectively reasonable police officer." *Ornelas*, 517 U.S. at 696; *Illinois v. Gates*, 462 U.S. 213, 232 (1983) (confirming that, in a probable cause determination, facts "must be seen and weighed . . . as understood by those versed in the field of law enforcement" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)); *Sellman v. State*, 449 Md. 526, 544 (2016). This determination necessarily contemplates "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231 (quoting *Cortez*, 449 U.S. at 418).

The United States Supreme Court and this Court have recognized "that a police officer may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas*, 517 U.S. at 700; *Ransome v. State*, 373 Md. 99, 104–05 (2003). Such "inferences . . . and deductions about the cumulative information available to [police officers] . . . 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418). Indeed, "[a] factor that, by itself, may

13

be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome*, 373 Md. at 105.

It is, moreover, a "basic and well-established principle[] of law" that courts reviewing a probable cause determination are not to view each fact "in isolation," but rather "as a factor in the totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003) (concluding that to do otherwise "is mistaken in light of our precedents")); *Ransome*, 373 Md. at 104 (requiring courts to "look at the 'totality of the circumstances' and not parse out each individual circumstance for separate consideration"). The obligation to review a probable cause determination in light of the totality of the circumstances "precludes" a "divide-and-conquer analysis." *Arvizu*, 534 U.S. at 274.

Probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas*, 517 U.S. at 696. Probable cause is "a fluid concept," *Gates*, 462 U.S. at 232, "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances," *Pringle*, 540 U.S. at 371. It is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 370 (quoting *Gates*, 462 U.S. at 231); *see also Florida v. Harris*, 133 S. Ct. 1050, 1056 (2013). "'[T]he *quanta* . . . of proof' appropriate in ordinary judicial proceedings are inapplicable" to the probable cause determination; consequently, "[f]inely

14

tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable cause] determination." *Id.* at 371 (quoting *Gates*, 462 U.S. at 235). In short, probable cause "is not a high bar." *Wesby*, 138 U.S. at 586 (quoting *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)).

B. Carroll, *Its Progeny, and Related Case Law*

The undergirding rationale of our analysis and holding has its genesis in *Carroll*, and we begin with a review of that decision. In that case, law enforcement officers had probable cause to believe that a vehicle contained contraband, to wit, bootleg liquor. 267 U.S. at 160. After stopping the suspected vehicle, the police commenced a warrantless search of the interior. *Id.* at 174. After seeing no contraband in plain view, an agent tore open the upholstery of the "lazyback" and discovered bottles of liquor. *Id.* at 172. After examining the history of warrantless searches of vessels, carriages, and wagons—as opposed to homes or other buildings—the Supreme Court concluded that the search was reasonable under the meaning of the Fourth Amendment. *Id.* at 153. The Court reasoned that securing a warrant to search a vehicle for contraband goods is impractical "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.* Accordingly, where probable cause is present, "contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant." *Id.* The automobile exception to the warrant requirement was thus conceived.

In *Ross*, the Court refined the exception. There, police officers acted on an informant's tip that a certain individual was selling narcotics stored in the trunk of a

15

specific vehicle and that additional narcotics were in the trunk. 456 U.S. at 800. Officers stopped the vehicle and searched the trunk without a warrant. Inside the trunk, they found a closed paper bag within which were glassine bags containing a white powder later identified as heroin. *Id*. at 801. Officers drove the vehicle to headquarters, "thoroughly searched the car," and found a zippered leather pouch in the trunk containing $3,200.00. *Id*.

The Court in *Ross* squarely addressed the question left unanswered by *Carroll*, namely the scope of a warrantless search of a vehicle. The Court held that the scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Id*. at 824. For example, "probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab." *Id*. Notably, the Court held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents that may conceal the object of the search*." *Id*. at 825 (emphasis added). The Court emphasized that a warrantless search under the automobile exception is "no broader and no narrower than a magistrate could legitimately authorize by warrant." *Id*. at 825. Indeed, "[o]nly the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." *Id*. at 823. Given the substance of the informant's tip that, *inter alia*, additional narcotics were in the trunk, the Court held that "in this case police officers had probable cause to search [the] entire vehicle." *Id*. at 817 & n.22.

16

Nine years after *Ross*, the Court had occasion in *California v. Acevedo*, 500 U.S. 565 (1991), to decide whether officers require a warrant to search a container inside a vehicle when they lack probable cause to search the entire car. *Id*. at 573. There, law enforcement tracked a package containing marijuana to an address, after which they saw a man leave the address with a paper bag that appeared full, place the bag in the trunk of a car, and drive away. *Id*. at 566–67. Officers stopped the vehicle, opened the trunk and bag, and found marijuana. *Id*.

The Court stated that the rule set forth in *Ross* controlled. *Id*. at 579. Unlike *Ross*, however, the police in *Acevedo* had probable cause to believe a particular container, not the entire vehicle, contained contraband. As a result, the Court held that the scope of the search in *Acevedo* extended only to a container inside the trunk, as the police lacked probable cause to believe contraband was concealed in any other part of the vehicle. *Id*. at 579–80. In so concluding, the Court wrote that it was announcing "one rule to govern all automobile searches" under *Carroll*: "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id*. at 580.

The Supreme Court's decision in *Wyoming v. Houghton*, 526 U.S. 295 (1999), also bears on our analysis. In that case, the Court addressed whether a warrantless search may extend to a passenger's belongings inside a vehicle that the police have probable cause to believe contains contraband. *Id*. at 297. There, an officer initiated a traffic stop and, while questioning the driver, the officer noticed a hypodermic syringe in the driver's shirt pocket. *Id*. at 297–98. "With refreshing candor," the driver admitted that he used the needle for

17

drugs. *Id.* at 298. A warrantless search was conducted of the interior of the vehicle, including a purse belonging to one of the passengers, Sandra Houghton. Ms. Houghton was arrested after drug paraphernalia and a syringe containing methamphetamine were discovered inside her purse. *Id.* She challenged the search of her purse. Concluding that *Ross* did not distinguish among containers based on ownership, the Court established that officers, armed with probable cause to search a vehicle, "may inspect passengers' belongings found in the car that are capable of concealing the object of the search"—there, additional drugs or contraband. *Id.* at 307. The Court reasoned that "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 304–05; *see also Pringle*, 540 U.S. at 373–74 (holding that a common enterprise could be reasonably inferred among all occupants of the vehicle, thereby providing probable cause to believe that the front-seat passenger possessed drugs, solely or jointly).

C. *The Parties' Contentions*

The State argues that the Court of Special Appeals erred in two significant respects. First, the State contends that the intermediate appellate court ignored the suppression court's findings that suggested Respondent and Mr. Haqq were jointly concealing contraband. That court disregarded, *inter alia*, Respondent's and Mr. Haqq's furtive movements before and during the stop; Respondent's and Mr. Haqq's extreme nervousness and evasive answers; the passengers' prior convictions for possession with intent to distribute; and Respondent's reaction when the canine unit arrived. Instead, the Court of Special Appeals focused "solely" on the evidence that Mr. Haqq possessed marijuana and

had PCP on his breath. *Johnson*, 232 Md. App. at 244, 259, 271. As a consequence, the State argues that the Court of Special Appeals improperly concluded that the object of the search was to find contraband that Mr. Haqq, alone, concealed in Respondent's vehicle and not, as the totality of the circumstances suggested, additional drugs or contraband—whether jointly or severally owned—in Respondent's vehicle.

Second, the State argues that the Court of Special Appeals misunderstood the scope of the search as limited to the passenger compartment of Respondent's vehicle. The State argues that *Ross*, and not *Acevedo*, controlled the scope of the search in this case. Where, as here, there is a fair probability that additional drugs or contraband may be located somewhere in a vehicle, officers have probable cause to search every part of the vehicle where additional drugs or contraband could be found, including the trunk.

For her part, Respondent argues that the facts available to the police before and during the traffic stop did not establish probable cause to search the trunk of her vehicle. Respondent mentions that nothing connected Mr. Haqq's drug possession and the smell of PCP on his breath to her; rather, the circumstances of the stop—and testimony of the officers at the suppression hearing—established a reasonable belief that any additional drugs or contraband were Mr. Haqq's alone and to be found only in the passenger compartment. Respondent therefore argues that *Acevedo* controlled and any search of Respondent's vehicle was limited to that location. After a search of the passenger compartment revealed no contraband, the police were not authorized to expand their search to other areas of the car.

Respondent further argues that this Court distinguishes between owner-drivers and

19

non-owner-passengers such that police may not impute contraband found on a passenger to an area of a car outside that passenger's control. Passengers are not presumed to have access to the trunk, Respondent claims, and the police could not assume, simply by virtue of the fact that Mr. Haqq and Respondent were traveling in the same vehicle, that they were engaged in joint criminal conduct. Instead, the police were required to establish a reasonable basis to conclude that joint criminal activity was afoot. Respondent contends that they failed to carry that burden here.

D. *Analysis*

This case presents a straightforward application of the automobile exception to the warrant requirement and the standard of review that appellate courts are to apply to a suppression court's probable cause determination. There is no dispute that Officer Sheehan lawfully stopped Respondent's vehicle for a traffic violation. Nor could Respondent successfully complain that, if the police had probable cause to believe that Respondent, Mr. Haqq, and presumably Mr. Helms, the backseat passenger—or any subset of the three—were transporting additional drugs, the police were free to search anywhere in the car where drugs could be located. Respondent's argument relies on the false premise that the officers lacked probable cause to search the trunk of her vehicle because, at the time of the search, the officers' probable cause belief focused solely on her front seat passenger, Mr. Haqq.

Respondent's argument flails on the shoals of that faulty premise, as it ignores nearly all of the relevant facts and circumstances known to the officers by the time they undertook the search of the trunk. When those facts and circumstances are viewed in their

20

entirety and through the lens of the officers' training and experience, the police had reason to believe that additional drugs or contraband were located somewhere within Respondent's vehicle, regardless of who in the car owned those drugs. The officers, therefore, were authorized to search "*every part of the vehicle* and its contents that may conceal the object of the search," including Respondent's trunk. *Ross*, 456 U.S. at 825 (emphasis added).

The stop was initiated by Officer Sheehan, a twelve-year veteran of the Montgomery County Police Department assigned to a unit specializing in crime suppression in high-crime areas. The suppression court credited Officer Sheehan's training and experience in drug suppression. *See Ornelas*, 517 U.S. at 700 (requiring reviewing courts to afford "due weight to a trial court's finding that the officer was credible"). The stop occurred in a high-crime area, a "relevant contextual consideration[]" that an officer is "not required to ignore" when "determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Within moments of activating his emergency equipment, Officer Sheehan observed both Respondent and Mr. Haqq engage in simultaneous "furtive movements" inside her vehicle. Respondent leaned over and reached toward the passenger seat as if she was "manipulating something in the center console area" while Mr. Haqq raised and lowered himself in the seat three to four times, reaching to the floor area. Given his training and experience, Officer Sheehan's first thought was that Respondent and Mr. Haqq may be trying to conceal drugs or weapons. The coinciding movements of Respondent and Mr. Haqq persisted, even as Officer Sheehan approached Respondent's driver's side window.

21

When Officer Sheehan introduced himself, Mr. Haqq "bolt[ed] to a straight upright position and then tuck[ed] his sweatshirt or shirt over his knees" with "exaggerated immobility," and Respondent "bounce[d] back" into the driver's seat.

The suppression court credited, and we give due weight to, Officer Sheehan's observation that Respondent's nervousness was beyond that of normal nervousness that he encountered throughout his "thousands of traffic stops." She had a "nervous, shaky voice"; her carotid pulse was "beating rapidly"; and she fumbled to find her driver's license, her hands trembling as she passed by it several times. Such nervousness, however, was not limited to Respondent, and the suppression court found as much. When Respondent asked Mr. Haqq to retrieve her registration, he provided no assistance, instead displaying an "unusual degree of nervousness in these actions." For the suppression court, the demonstrated nervousness was "beyond ordinary" on "*both* defendants' behalf" during an otherwise routine traffic stop. (Emphasis added). Such an "exaggerated level of nervousness" became, in the words of the suppression court, "one of the building blocks that the officer utilized."

When Officer Sheehan returned to his vehicle to input Respondent's information, Mr. Haqq's furtive behavior continued. He began "moving back and forth," "lifting up off his seat and leaning back," and appearing to "reach[] around" the inside of the car. When additional officers arrived, Respondent gave evasive or vague answers regarding the movements inside the vehicle, her friendship with Messrs. Haqq and Helms, and their destination that evening.

Once his fellow officers obtained identification information from the names of both

22

passengers, Officer Sheehan returned to his patrol car to check whether Messrs. Haqq and Helms had outstanding warrants. As he had done in running Respondent's warrant check, he ran the men's information through NCIC, E-Justice, LInX, and Case Search. Officer Sheehan learned that both Mr. Haqq and Mr. Helms had prior convictions of possession with intent to distribute or distribution of a controlled dangerous substance and that Mr. Haqq had prior convictions of assault on law enforcement.

Although a consent search of Respondent's pockets did not reveal contraband, Officer Sheehan observed Respondent look up and put her head down when a canine unit arrived. When asked if she believed there was a reason the canine would "hit" on her car, she would not answer until asked a second time, to which she responded, "No." Officer Sheehan can be later heard via the dashcam recording telling the canine officer that, given Respondent's reaction and her and Mr. Haqq's movements, he was "pretty sure" the dog would "hit" on her vehicle. A consent search of Mr. Haqq revealed over thirteen grams of marijuana on his person and an odor of PCP on his breath. After arresting Mr. Haqq and searching the passenger compartment, the police proceeded to the search of Respondent's trunk.

The search of the trunk comported with the case law of the Supreme Court and this Court. The above facts, viewed in their totality and through the lens of the officers' experience and expertise, gave rise to probable cause that the trunk contained additional drugs or other contraband. *See, e.g.*, *Arvizu*, 534 U.S. at 273; *Ornelas*, 517 U.S. at 696; *Gates*, 462 U.S. at 232; *Ransome*, 373 Md. at 104–05. Probable cause, we must remember, is not a "high bar." *Wesby*, 138 S. Ct. at 586. The officers in the present case were not

required to believe it more likely than not that the trunk contained additional drugs or drug-related paraphernalia, *Pringle*, 540 U.S. at 371 (citing *Gates*, 462 U.S. at 235); they needed only to have enough information to support a fair probability that evidence of such a crime would be found there, *Gates*, 462 U.S. at 238. Because the suppression court was correct as a matter of law in concluding that the officers complied with the Fourth Amendment in searching the trunk, we hold that the court correctly denied Respondent's motion to suppress the evidence found therein.

For these same reasons, we further hold that the Court of Special Appeals erred in reversing the suppression court's ruling. The intermediate appellate court did so by failing to view, in their entirety, the facts and circumstances that led the police to search the trunk of Respondent's car. Instead, that court isolated certain facts while ignoring or minimizing others, and it drew its own inferences from the facts it did consider, rather than from the inferences drawn by the trained officers and credited by the suppression court as reasonable under the case law.

We therefore are compelled to vacate the judgment of the Court of Special Appeals. We remand the case for the court to decide the first of the two questions presented to, but not addressed by, that court.[5]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO CONSIDER THE FIRST QUESTION**

---

[5] *See supra* note 4 and accompanying text.

24

**PRESENTED FOR ITS REVIEW. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Montgomery County
Case No. 126667C
Argued: December 1, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 22

September Term, 2017

_____

STATE OF MARYLAND

v.

CASEY O. JOHNSON

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Hotten, J., which
Adkins, J., joins.

_____

Filed: April 20, 2018

Respectfully, I must part company with the Majority. At issue is the propriety of the warrantless search of a vehicle's trunk owned and operated by the Respondent, Ms. Casey O. Johnson, following a search of the vehicle's passenger and the seizure of a controlled and dangerous substance on his person.

The U.S. Supreme Court has made clear that when the police stop an automobile and detain its occupants, the detention is a seizure, generating a Fourth Amendment moment. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573 (1985). The Supreme Court has also held that a search conducted without a warrant is presumptively unreasonable. *Riley v. California*, 134 S.Ct. 2473, 2482 (2014). *See id.* (opining that "reasonableness generally requires the obtaining of a judicial warrant.") (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). Here, the initial Fourth Amendment moment began when Officer Sheehan stopped Johnson's vehicle to issue a repair order for the broken tail light. However, after the initial stop, Officer Sheehan's conduct expanded and encroached into a constitutionally protected space. Once the validity of the traffic stop was established by probable cause, a search of the trunk required either the benefit of a warrant or an appropriate exception to the warrant requirement.

The police officers may have had probable cause to search the interior passenger compartment of Johnson's car, but lacked probable cause to search Johnson's trunk under the circumstances presented. In *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280 (1925), the Supreme Court carved out a now well-known exception to the warrant requirement, commonly referred to as the automobile exception. The *Carroll* doctrine

permits police officers to search a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime or contraband. *Id.* at 156–57, 45 S.Ct. 286–87. As the Majority has clearly analyzed, probable cause is "a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Florida v. Harris,* 568 U.S. 237, 244, 133 S.Ct. 1050, 1056 (2013). It requires "less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion" or hunch. *Wengert v. State,* 364 Md. 76, 90, 771 A.2d 389, 397 (2001) (quoting *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281, 1290 (1988)) (internal quotations omitted). However, a probable cause determination cannot be based on the subjective thoughts or reasons of a police officer. *Sellman v. State,* 449 Md. 526, 542, 144 A.3d 771, 781 (2016). The Fourth Amendment "does not allow the law enforcement official to simply assert that apparently innocent conduct was suspicious to him or her; rather the officer must offer the factual basis upon which he or she bases the conclusion." *Bost v. State*, 406 Md. 341, 356–57, 958 A.2d 356, 365 (2008).

The exception to the warrant requirement finds its roots in a bevy of reasons, often related to the mobility of an automobile. The justification lies in the clear differences in a reasonable expectation of privacy held in a person's automobile, rather than a person's home or office. *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979 (1970). Specifically, it is not practical for officers to secure a warrant for a target that is readily movable, when evidence can be quickly destroyed or removed from the officers'

2

jurisdiction. *Carroll*, 267 U.S. at 153, 45 S.Ct. at 285. Before this Court, Johnson challenges the police officers' lack of probable cause to search the trunk. Thus, whether the officers' search of Johnson's trunk was supported by probable cause, following the consensual search of the front seat passenger, requires an interpretation and direct application of the *Carroll* doctrine and its progeny.

Johnson asserts that the *Carroll* doctrine, or automobile exception, did not give police officers authority to search the entire vehicle, but rather the scope of the search must be specifically limited to places police officers have probable cause to search for the object of the suspected criminal activity. The crux of the State's arguments counters that there were circumstances indicating that Johnson and the front passenger were jointly concealing contraband in Johnson's vehicle. The State cites the consensual search of the passenger, which revealed marijuana on his person and PCP on his breath, along with Johnson and her passenger's nervous behavior, as a basis for a fair probability that additional drugs or contraband would be located anywhere in Johnson's vehicle. On this proposition, the Majority agrees, asserting that "the police had reason to believe the additional drugs or contraband were located somewhere within [Johnson's] vehicle, regardless of who in the car owned those drugs. The officers, therefore, were authorized to search every part of the vehicle and its contents that may conceal the object of the search[.]" Majority Slip Op. at 21 (emphasis and internal quotations omitted). However, this premise ignores Supreme Court precedent that limits the object of a search where the items of the particularized evidence of contraband may be found, which in this instance, based on the facts and

3

circumstances known to the officers at the time of the search, was limited to the passenger compartment of Johnson's vehicle.

A reading of *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982 (1991) and *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157 (1982) supports the conclusion that a warrantless *Carroll* search is limited to the places that police have probable cause to believe evidence of a crime or contraband is located. The nature of the search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Ross,* 456 U.S. at 824, 102 S.Ct. at 2172. The Supreme Court has explained that "[p]robable cause to believe that a container placed in the trunk of a [vehicle] contains contraband or evidence does not justify a search of the entire [vehicle]." *Id.* Conversely, probable cause to search a vehicle's passenger compartment does not create probable cause to search the vehicle's trunk. *Acevedo* and *Ross* are particularly instructive in highlighting the limitations of the warrantless automobile search first addressed in *Carroll*. In *Ross*, detectives received a reliable tip that Ross just completed a narcotics sale, and additional narcotics would be located in his vehicle's trunk. 456 U.S. at 800, 102 S.Ct. at 2160. After corroborating the vehicle and driver's identification with the informant's tip, the officers stopped Ross. *Id.* at 801, 102 S.Ct. at 2160. The officers searched the vehicle's trunk and recovered narcotics from a brown paper bag. *Id.* As analogized in *Ross*, the Court explained that "probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase." *Id.* at 824, 102 S.Ct. at 2172.

4

In *Acevedo*, following a reliable tip that an individual would be receiving a package of marijuana, police officers began surveillance that confirmed their suspicion. *Acevedo, 500 U.S. at 567, 111 S.Ct. at 1984.* The officers then observed Acevedo place a brown paper bag believed to contain marijuana in the trunk of a car and drive away. *Id.* Based on the police officers' observations, and the facts known to them at the time, they believed that the brown bag contained marijuana. *Id.* The police officers conducted a stop of the vehicle, and then searched the brown bag located in the trunk. *Id.* at 567, 111 S.Ct. at 1985. The officers recovered marijuana. *Id.* Discussing *Ross*, the *Acevedo* Court specifically concluded that where an officer has probable cause to search a vehicle, the officer may additionally search containers within the vehicle. *Id.* at 580, 111 S.Ct. at 1991. However, *Acevedo*'s holding "neither extends the *Carroll* doctrine nor broadens the scope of the permissible automobile search…." *Id.* Thus, without some other individualized probable cause, the scope of the police officer's search must be limited to the places, or containers, within the vehicle that could specifically contain evidence of a crime or contraband.

*Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297 (1999), where the Supreme Court addressed the rights of a vehicle's passenger, does not alter this analysis. In *Houghton*, the officers had probable cause to search the vehicle's cabin when the driver told the officers that he used the syringe in his shirt pocket "to take drugs." 526 U.S. at 298, 119 S.Ct. at 1299. The officers then searched one of the occupant's purses that was located in the vehicle. *Id.* The Court explained that "[a] passenger's personal belongings, just like the driver's belongings or containers attached to the car like a glove compartment,

5

are in the car, and the officer has probable cause to search for contraband in the car." *Id.* at 302, 119 S.Ct. at 1301 (internal quotations omitted). However, the Court reasoned, and the Majority posits, "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 304–05, 119 S.Ct. at 1302. Reliance on *Houghton* ignores the critical fact that the contraband at issue in that case was located in the vehicle's passenger compartment. The search in *Houghton* was clearly within the bounds of *Ross* and *Acevedo* because the search was limited to the places where the vehicle's driver, who possessed the syringe, could have reached. Here, Johnson's front seat passenger was the target of the search, and the officers did not establish an independent link to believe that he would have access to Johnson's trunk.

**Furtive Movements and Nervousness**

The State maintains, and the Majority agrees, that one of the major factors establishing the existence of probable cause was that both the passenger and Johnson appeared distinctly nervous and exhibited furtive movements. *See* Majority Slip Op. at 18, 22. Officer Sheehan attested that in his twelve years of experience conducting traffic stops, he developed a sense for "traffic stop nervous," which he described as "a normal baseline for a person that I just stopped for a regular violation." Johnson, however, was "extremely nervous," according to Officer Sheehan, who described Johnson's "trembling" hands "fumbl[e] through her wallet for her license." Following the initial stop, Officer Sheehan

6

explained that through the rear window of the vehicle, he witnessed Johnson and the front-seat passenger, making "furtive movements." Specifically, he observed:

> It looked like [Johnson] may have been manipulating something in the center console area. She was bent over it. I could see her hand, her left hand on the steering wheel as she bent over the center console area, reaching in that area and reaching over towards Haqq's seat…. I could see her, portion from her elbow up moving, and I could see her shoulder. I couldn't see her arm. I'm sorry. Her hand.

****

> [Haqq] was moving around in his seat. He appeared to be either reaching under his seat on to the floorboard in front of his seat, and occasionally would lift his rear end up off the seat and then bring it back down, as if he was either trying to reach underneath where he was sitting, or the seat or the floorboard.

Particularly, the State proposed that Johnson's answers to officer questioning were vague and evasive. Around 7:32 p.m., Officer Sheehan asked Johnson to step out of the car so that he could show her the broken rear light and ask her a few questions. At this point, the audio from Officer Sheehan's camera recorded the following exchange:

> Officer Sheehan: Who are these people in the car with you?
>
> Ms. Johnson: Oh. My friends.
>
> Officer Sheehan: Friends? Where are y'all coming from?
>
> Ms. Johnson: Coming from right over here.
>
> Officer Sheehan: Okay. And then stopping you, I could see a lot of movement in the car, all right?
>
> Ms. Johnson: Oh. Okay.
>
> Officer Sheehan: Okay? You were moving around a lot, he was moving around an awful lot, front passenger, and I couldn't see him because of the salt on the window[.]
>
> Ms. Johnson: Oh. Okay.
>
> Officer Sheehan: What were you guys doing?

7

Ms. Johnson: Oh, nothing.  I was just, I mean, moving around, because I don't understand.  I was just (unintelligible), I wasn't doing anything.

Officer Sheehan: Okay.  All right.  Is anything illegal in the car that I need to know about? No drugs?

Ms. Johnson: No.

Officer Sheehan: No weapons?

Ms. Johnson: No, sir.

Officer Sheehan: Okay.  Where do these guys live? Do they live in the area?

Ms. Johnson: Yeah.

Officer Sheehan: Okay.  How long have you known them for?

Ms. Johnson: I don't know.  You know, about a month?

Officer Sheehan: Do you know if they have anything illegal on them?

Ms. Johnson: No.  No sir.

Officer Sheehan: Okay.  Nothing illegal in the car.

Ms. Johnson: No.

Officer Sheehan: Can I search your vehicle to make sure there's nothing illegal inside there?

Ms. Johnson: I'm not understanding why you need to?

Officer Sheehan: I just explained why.  Because after I stopped you, you guys were moving around an awful lot.

Ms. Johnson: I understand that, I'm just saying that, to me, I'm not understanding why you have to search the car?

Officer Sheehan: I don't have to.  I'm just asking consent.

Ms. Johnson: Yeah.  I just don't think that that's appropriate, but—

Officer Sheehan: Okay.  So, you don't want me to.

Ms. Johnson: I mean, I mean, I don't—no. Because I don't understand why you need to.

Officer Sheehan: Okay.  That's fine. I've talked to you, I just thought that I might (unintelligible) them too.

Ms. Johnson: Yeah, I mean. I mean.  No.

8

Johnson unequivocally denied Officer Sheehan consent to search her vehicle. But soon thereafter, she did consent to Officer Sheehan's request to search the outer two pockets of her sweatshirt. That search did not reveal any contraband or weapons. However, citing this interaction, the State asserts that Johnson was more evasive than usual, indicative of criminal behavior.

I respectfully disagree that the above noted exchange, even with the officers' observation that Johnson appeared nervous, gives rise to probable cause. The Majority asserts that the nervousness and "furtive movements" exhibited by the passenger and Johnson gave the officers probable cause to believe that there was a joint criminal effort, and as a result, would yield drugs from the trunk. Majority Slip Op. at 21–22. However, to support a finding of probable cause, the State must identify facts that support a police officer's characterization of behavior as suspicious. *See Holt,* 435 Md. at 461, 78 A.3d at 425. We have explained that, "nervousness, or lack of it, of the driver pulled over by a Maryland State [officer] is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs." *Ferris v. State*, 355 Md. 356, 388, 735 A.2d 491, 508 (1999) (quoting *Whitehead v. State*, 116 Md. App. 497, 505, 698 A.2d 1115, 1119 (1997)). The State characterizes that these facts, in addition to Officer Sheehan's testimony at trial, demonstrate that probable cause existed to search Johnson's trunk. To the extent that the passenger was reaching under or around his seat, the police officers needed independent cause to believe that his behavior was connected to Johnson. Further, Johnson's behavior is similarly indicative of an individual at a traffic stop searching for

9

her license or registration. As such, I disagree with the State's reliance on Johnson's nervousness, and any furtive movements to establish probable cause to search the vehicle's trunk.

**Imputing the Contraband on the Passenger's Breath and Person to Johnson**

I disagree with the premise that the drugs found on the passenger created probable cause to search Johnson's trunk. To justify a warrantless search beyond that area of the vehicle allowed under the *Carroll* doctrine and its progeny, the police were required to establish a reasonable basis to conclude the passenger and Johnson were engaged in a joint criminal effort to conceal drugs. On this point, the Majority provides little on Johnson's part, besides her nervous behavior, to indicate that she was engaging in criminal activity with the passenger. However, the Majority expressly relies on Officer Sheehan's discovery through multiple law enforcement databases that the car's two passengers, not Johnson, had prior convictions related to controlled and dangerous substances. Majority Slip Op. at 23. The Majority overlooks that these cited factors, the passengers' prior drug convictions, the PCP found on one passenger's breath, and the marijuana recovered from the passenger's waistband, can solely be attributed to the vehicle's passengers.

The drugs recovered from the passenger gave police officers probable cause to search Johnson's passenger compartment, but did not establish probable cause to search the trunk. We have explained that where a common enterprise is undertaken, officers have probable cause to search all parties to that enterprise. *See Maryland v. Pringle*, 540 U.S. 366, 373, 124 S.Ct. 795, 801 (2003). However, there must be a link between the driver

10

and a passenger for probable cause to attach to both. *State v. Wallace*, 372 Md. 137, 158, 812 A.2d 291, 304 (2002). As a result, the police may not impute evidence of a crime found on a passenger to an area of a car that is outside the passenger's presumed control. *Id.* at 158–59, 812 A.2d at 304. There must be additional, fact-driven, reasoning for the police officers to reasonably believe that the vehicle's operator, in this case Johnson, is also engaged in drug activity.

The Supreme Court has also expressly rejected imputing probable cause to search a vehicle's occupant, purely based upon the individual's presence in a vehicle. In *United States v. Di Re*, an informant told a federal investigator that Reed was to receive contraband, namely counterfeit gasoline ration coupons, from a certain Buttitta. 332 U.S. 581, 583, 68 S.Ct. 222, 223 (1948). At the identified location, the investigator saw Reed holding gasoline ration coupons in a vehicle. *Id.* There were two other occupants in the car: Buttitta in the driver's seat and Di Re in the front passenger's seat. *Id.* After being engaged by the investigator, Reed indicated that Buttitta gave him the counterfeit coupons. *Id.* All three of the vehicle's occupants were arrested and searched. *Id.* The search of Di Re's pockets yielded several oil ration coupons, and a full search of his person produced one hundred gasoline ration coupons. *Id.* Determining that the officer lacked probable cause to believe that Di Re was involved in the crime, the Court opined that "if the presence of Di Re in the car did not authorize an inference of participation in the Buttitta-Reed sale, it fails to support the inference of any felony at all." *Id.* at 593, 68 S.Ct. at 228. The Court based

11

the lack of criminal inference upon the fact that the officer had "no evidence that is a fact or that the officers had any information indicating that Di Re was in the car when Reed obtained the coupons from Buttitta, and none that he heard or took part in any conversation on the subject." *Id.* On these grounds, the Court concluded that "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person." *Id.* at 594, 68 S.Ct. at 228.

*Di Re* is minimally distinguishable because there is no informant in the case at bar. However, Officer Sheehan similarly lacked evidence to believe that Johnson was involved in her front seat passenger's crime. Like in *Di Re*, once the front seat passenger was singled out as the individual concealing contraband, probable cause could not be immediately imputed to the other vehicle occupants. Because the drugs were found on the front passenger's person, the smell of PCP on his breath, and the perception by the officers that both Johnson and the front seat passenger were nervous, the police concluded that probable cause existed to believe that Johnson was also transporting drugs. None of the officers smelled PCP emanating from Johnson's breath. None of the officers witnessed Johnson access, motion towards, or conceal drugs in her trunk. Based on the circumstances known to the officers at the time of the search, neither passenger had control over Johnson's trunk. Outside of Johnson's demeanor, which the State and the Majority characterized as nervous, there was no independent probable cause to believe that Johnson was transporting drugs along with the passenger. The officers needed additional facts to bridge the divide between the vehicle's interior and its trunk. The

12

officers had no such facts, and for that reason, I disagree with the Majority's holding that

the police officers had probable cause to search Johnson's trunk.

**CONCLUSION**

For the reasons expressed above, I dissent. As was so concisely expressed by the

Court of Special Appeals:

> The factual circumstances surrounding the stop of Johnson's vehicle fell short of establishing probable cause that she was transporting contraband in the trunk of her car. Because the scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found," *Ross*, 456 U.S. at 799, 102 S.Ct. 2157, before the police may conduct a warrantless search of the trunk of a vehicle, the police must either have probable cause to believe drugs are in the car generally, or, as in this case, where the police find drugs on a passenger, they must articulate a particularized basis to search the trunk, such as the reasons for their belief that the passenger had access to the trunk. Here, the officers lacked probable cause to believe that drugs were in the trunk based solely on the drugs found on the breath and in the waistband of the front-seat passenger. Consequently, the suppression court concluded erroneously that the officers were permitted to search the trunk of the car under the *Carroll* Doctrine.

*Johnson v. State*, 232 Md. App. 241, 271, 157 A.3d 338, 356 (2017).

Judge Adkins has authorized me to state that she joins this Dissenting Opinion.

13