*Karl Joseph Tomanek v. State of Maryland*, No. 972, Sept. Term 2022.  Opinion filed on May 1, 2024, by Ausby, J.


**SEARCH, SEIZURE, AND ARREST – SEARCH WARRANTS – GROUNDS FOR ISSUANCE – IN GENERAL – NECESSITY OF PROBABLE CAUSE**

Geofence warrant for seizure of cell phone location data was based on probable cause and was sufficiently particular, where police officers averred facts giving rise to fair probability that a crime had taken place within the geographic and time constraints of the warrant, likelihood that an innocent person's privacy rights would be violated by the search was remote, and magistrate issuing warrant could reasonably infer that the perpetrator had a cell phone.

Circuit Court for Howard County
Case No. C-13-CR-21-000043

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 972

September Term, 2022

KARL JOSEPH TOMANEK

v.

STATE OF MARYLAND

Wells, C.J.
Tang,
Ausby, Kendra Y.
　　　(Specially Assigned),

JJ.

Opinion by Ausby, J.

Filed: May 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

On January 14, 2021, Howard County Police officers executed a search warrant at the residence of Karl Tomanek, appellant, after Tomanek was developed as a suspect in the theft of farm equipment. While the officers were driving up Tomanek's driveway to execute the warrant, Tomanek fired a shotgun at the officers' vehicle. Tomanek was eventually arrested, and a search of the residence revealed several shotguns, a rifle, and various ammunition. Tomanek was later charged, in the Circuit Court for Howard County, with multiple counts of attempted murder, assault, and reckless endangerment, along with related weapons offenses. Prior to trial, Tomanek filed a motion to suppress, arguing that the search warrant was facially invalid and that the police had used excessive force in executing the warrant. Following a hearing, the suppression court denied Tomanek's motion. A jury ultimately convicted Tomanek of one count of attempted manslaughter, one count of second-degree assault, one count of use of a firearm in a crime of violence, and five counts of possession of a shotgun, rifle, or ammunition by a prohibited person. The circuit court sentenced Tomanek to a total term of twenty years of imprisonment, with all but ten years suspended.

In this appeal, Tomanek presents a single question for our review:

Did the suppression court err in denying the motion to suppress?

For reasons to follow, we hold that the suppression court did not err in denying Tomanek's motion. Accordingly, we affirm the judgments of the circuit court.

## BACKGROUND

On April 11, 2020, the Howard County Police Department received a report of a theft that had occurred at a vacant, twelve-acre farm located on Old Frederick Road (the

"Frederick Road" property).  Upon responding to the scene, officers spoke with the property owner, who reported that farm equipment and various other items had been taken. The owner stated that a family member had last visited the property on April 4, 2020, when the stolen items were still on the property.  The owner stated that when he arrived at the property a week later, the items were gone.

On April 24, 2020, the police applied for a "geofence warrant" to be served on Google.  "A geofence warrant authorizes the seizure of location data collected from smartphones of individuals within a particular area over a specified range of time." *United States v. Rhine*, 652 F. Supp. 3d 38, 66 (D.D.C. 2023). It "seeks cell phone location data stored by third-party companies like Google, which offers the Android operating system on which millions of smart phones run and offers other applications commonly used on phones running on other operating systems." *Id.* at 66-67.  Because "[t]he scope of location data captured by a geofence is limited by geographic and temporal parameters," "geofence warrants identify the physical area and the time range in which there is probable cause to believe that criminal activity occurred." *Id.* at 67. "Unlike a warrant authorizing surveillance of a known suspect, geofencing is a technique law enforcement has increasingly utilized when the crime location is known but the identities of suspects is not." *Id.* at 66.

As the police explained in the warrant application, Google was known to collect and retain historical location information for certain mobile devices.  The purpose of the warrant was to ascertain if any such device was in the area of the Frederick Road property

2

between April 3 and April 11, 2020, when the theft was believed to have occurred. The court granted the warrant application, and a search warrant was served on Google.

On December 8, 2020, Google responded to the warrant, informing the police that nine different devices had shown activity within 100 meters of the Frederick Road property during the time period in question. Upon reviewing the information provided by Google, the police discovered that only one of those devices showed activity on and around the property on multiple dates for extended periods of time consistent with the timeframe of the theft. The police then contacted Google and discovered that the suspect device was associated with Tomanek, who lived on Shaffersville Road. Shortly thereafter, the police conducted a visual inspection of the property surrounding Tomanek's home and observed a tractor that matched the description of one of the items stolen from the subject property.

On January 11, 2021, the police applied for, and were granted, a warrant to search Tomanek's property for evidence related to the theft that had occurred at the Frederick Road property. On January 14, 2021, multiple police officers went to Tomanek's residence to execute the warrant. Several of the officers were traveling in a police-issued tactical vehicle. As the officers' vehicle was traveling up Tomanek's driveway toward his residence, Tomanek brandished a shotgun and fired two shots, both of which struck the police vehicle's windshield. Tomanek was soon taken into custody, and a search of his property revealed farm equipment that matched the description of the equipment stolen from the Frederick Road property.

That same day, the police obtained and executed a second search warrant at Tomanek's property based on the events that occurred during the execution of the first

warrant. In executing the second warrant, the police recovered various firearms and ammunition. Tomanek was thereafter charged with attempted murder, assault, reckless endangerment, and weapons offenses.

## SUPPRESSION HEARING

Prior to trial, Tomanek filed a motion to suppress, raising two primary arguments. One argument was that the initial geofence warrant was an illegal "general warrant" because it lacked sufficient particularity and probable cause. Tomanek claimed that, because the geofence warrant directly led to the issuance of the two warrants at his property, any evidence obtained as a result of those searches should be suppressed. The other argument was that the police had used excessive force in executing the first warrant at Tomanek's property. Tomanek claimed that, because the shooting was a direct result of that excessive force, the evidence derived therefrom, namely, the observations that shots were fired and the various firearms and ammunition found on his property, should be suppressed.

### *Geofence Warrant*

At the hearing on Tomanek's suppression motion, the court received into evidence the geofence warrant application and accompanying affidavit. The application was prepared by Howard County Police Detective Brian Bochinski, who had been a member of the police force since 2012 and was, at the time, working as a residential burglary detective.

Per that application, on April 11, 2020, Howard County Police officers responded to the Frederick Road property after receiving a report of a theft. Upon the officers' arrival, the property owner reported that five farm tractors, an antique dump truck, and two large

4

steel fuel containers were missing from the property. The owner described the property as a vacant, twelve-acre farm that included a residence, two large barns, and several outbuildings. The owner stated that a family member had last checked on the property on April 4, 2020, and observed that the stolen items were still there. The owner came to the property on April 11 and saw that the items were missing and that some of the buildings had been broken Into. The owner reported that "no trespassing" signs were posted on the property. On April 14, 2020, Detective Bochinski, while investigating the theft, contacted a witness, who reported that, at some point between April 3 and April 5, 2020, he observed an older model tractor being hauled on a trailer that was driving away from the Frederick Road property. The witness's description of the tractor matched the description of one of the tractors stolen from the Frederick Road property.

Based on that information, the affiant requested permission to search Google's business records for "anonymized DeviceID data" of cell phone users that reported a location within a 100-meter radius of the main residence of the Frederick Road property between April 3 and April 11, 2020.[1] The purpose of the request was to identify any devices that were in close proximity to the property during the time frame immediately preceding and following the thefts. The application noted that "anonymized DeviceID data does not contain personal identifying information about the end user," and that a second warrant "would be needed to access any personal identifying information related to an

_____

[1] The warrant application provided latitude and longitude coordinates of: 39.318792º, -76.935558º. Those coordinates correspond to the location of the main residence on the Frederick Road property.

5

account." Regarding Google's role in the request, the application provided the following pertinent facts:

> Google is an Internet company which, among other things, provides electronic communication services to subscribers. Google allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications . . . and information concerning subscribers and their use of Google services[.] . . . In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

> In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. . . . [S]uch information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide [sic] clues to their identity, location or illicit activities.

> In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. . . . In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account. . . . Based on my training and experience, I have learned that Google also maintains records that may reveal other Google accounts accessed from the same electronic device[.]

> Google has developed an operating system for mobile devices, including cellular phones, known as Android. Nearly every cellular phone using the Android operating system has an associated Google account and users are prompted to add a Google account when they first turn on a new Android device.

> Based on my training and experience, I have learned that Google collects and retains location data from Android-enabled mobile devices when a Google

6

account user has enabled Google location services. The company uses this information for location-based advertising and location-based search results. This information is derived from sources including GPS data, cell site/tower information, Bluetooth, and Wi-Fi access points.

Location data can assist investigators in understanding the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).

The warrant application was approved and signed by a circuit court judge on April 24, 2020.

### *Shaffersville Road Warrants*

The suppression court also received into evidence the two search warrants that were executed at Tomanek's residence on January 14, 2021. The first warrant, which was approved and signed by the circuit court on January 11, 2021, included a restatement of the events surrounding the theft, as well as additional details regarding the property stolen. According to the warrant's affiant, due to the amount of equipment taken from the Frederick Road property, it was "very likely" that the perpetrator had taken multiple trips to the property during the time frame between April 3 and April 11, 2020. The affiant noted that Google had responded to the geofence warrant in December 2020, and, in so doing, had provided nine different Device IDs that showed potential activity within the area and time frame set forth in the geofence warrant. Upon reviewing that information, the affiant noted that only one of those nine devices was "located on and around the

victim's property on multiple dates for extended periods of time consistent with the timeframe of the burglary."

Google subsequently disclosed the subscriber information for that device, including an email address and a phone number. The affiant "completed computer checks on the phone number" and found that it was associated with Tomanek. On January 7, 2021, the affiant went to Tomanek's home on Shaffersville Road and observed, from a public roadway, a tractor on Tomanek's property that matched the description of one of the tractors stolen from the Frederick Road property.

The second warrant, which was approved and signed by the circuit court on January 14, 2021, included much of the same information, as well as additional details regarding the shooting. Those additional details included: that police officers went to Tomanek's property on January 14, 2021, to execute the first warrant; that, as the officers approached Tomanek's residence in their tactical vehicle, two shots were fired, striking the vehicle's windshield; that Tomanek was identified as the shooter and eventually taken into custody; and that a shotgun and two spent shell casings were observed near the front step of Tomanek's residence.

Ultimately, both search warrants were executed on January 14, 2021. Upon executing the first warrant, the police recovered various evidence related to the theft at the Frederick Road property. Upon executing the second warrant, the police recovered various evidence related to the shooting and subsequent weapons charges.

### Excessive Force

During the suppression hearing, Howard County Police Officer Christopher Funk testified regarding the execution of the search warrants at Tomanek's property on January 14, 2021. According to Officer Funk, there were nineteen officers present that day, including himself, and all of the officers were dressed in tactical equipment and carrying weapons. The officers were split into two vehicles, with the lead vehicle being a "Bearcat," which Officer Funk described as a large, armored truck. At approximately 6:00 a.m., just before sunrise, the Bearcat entered Tomanek's property and began driving up the driveway toward Tomanek's residence. When the vehicle, which was unlit, got about fifty yards from Tomanek's residence, Tomanek fired two shots at the vehicle's windshield. Officer Funk testified that there were no weapons on the outside of the vehicle and that Tomanek could not have seen inside.

### Court's Ruling

The suppression court ultimately denied Tomanek's motion to suppress. As to the propriety of the geofence warrant, the court found that the warrant was supported by probable cause and was sufficiently limited in time and space. The court also found that, even if the warrant was invalid, the police were justified in relying on the warrant when executing the search. As to Tomanek's excessive force claim, the court found that any "force" used by the police prior to the shooting was reasonable.

### Trial

Tomanek was later tried by a jury on various charges related to the shooting. The jury convicted Tomanek of one count of attempted manslaughter, one count of second-

degree assault, one count of use of a firearm in a crime of violence, and five counts of possession of a shotgun, rifle, or ammunition by a prohibited person. This timely appeal followed. Additional facts will be supplied as needed below.

## STANDARD OF REVIEW

"Our review of a circuit court's denial of a motion to suppress evidence is 'limited to the record developed at the suppression hearing.'" *Pacheco v. State*, 465 Md. 311, 319 (2019) (quoting *Moats v. State*, 455 Md. 682, 694 (2017)). "[W]e view the evidence presented at the [suppression] hearing, along with any reasonable inferences drawable therefrom, in a light most favorable to the prevailing party." *Davis v. State,* 426 Md. 211, 219 (2012). "We accept the suppression court's first-level findings unless they are shown to be clearly erroneous." *Brown v. State*, 452 Md. 196, 208 (2017). "We give no deference, however, to the question of whether, based on the facts, the trial court's decision was in accordance with the law." *Seal v. State,* 447 Md. 64, 70 (2016). Where a party raises a constitutional challenge, "we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *State v. Johnson*, 458 Md. 519, 532-33 (2018).

## DISCUSSION

Tomanek contends that the suppression court erred in denying his motion to suppress. Tomanek presents two primary arguments: that the geofence warrant was invalid and that the police used excessive force. As discussed in greater detail below, we find no merit in either argument.

10

## I.

Tomanek's first argument is that the geofence warrant was an invalid "general warrant" that lacked sufficient particularity and probable cause. Tomanek contends that there was nothing in the warrant application to identify a particular suspect or to connect the crime to the use of any particular technology. Tomanek also contends that the warrant application was too broad in terms of the time period—approximately one week—over which the police were permitted to search. Tomanek argues that the warrant application constituted the sort of "general exploratory rummaging" that courts have consistently found to be a violation of the Fourth Amendment.

The State contends that the geofence warrant complied with the Fourth Amendment because it set forth a substantial basis for probable cause and contained the requisite particularity.[2] The State contends further that, even if the warrant was facially deficient, Tomanek is not entitled to suppression because the executing officers relied on the warrant in good faith. Finally, the State argues that, regardless of any impropriety in the warrant or its execution, Tomanek is not entitled to suppression because the evidence related to the shooting was sufficiently attenuated from the allegedly unlawful geofence warrant.

## A.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and searches conducted without a warrant are

---

[2] The State argues, preliminarily, that Tomanek has failed to allege a protected Fourth Amendment interest in his location information. That argument was not raised in the suppression court; therefore, it will not be considered here. *McClain v. State*, 194 Md. App. 252, 278-79 (2010).

11

generally presumed to be unreasonable. *Eusebio v. State*, 245 Md. App. 1, 21-22 (2020). Where, however, a search is conducted pursuant to a warrant, the warrant is presumed valid, and the burden of proving the unlawfulness of the search shifts to the defendant. *Id.* at 23. A search warrant may be deemed invalid if the warrant, on its face, fails to comply with the basic requirements of the Fourth Amendment. *Id.* Those requirements include: 1) that the warrant be based on probable cause, 2) that the warrant describe with particularity the place to be searched, and 3) that the warrant be issued by a neutral and detached magistrate. *Id.* at 23-24. Here, Tomanek challenges only the first two requirements: probable cause and particularity.

"[T]he probable cause standard is 'a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citing *Illinois v. Gates,* 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-176 (1949)). "Probable cause, moreover, is a fluid concept, incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Pacheco*, 465 Md. at 324 (quoting *McCracken v. State*, 429 Md. 507, 519-20 (2012)). "For that reason, probable cause does not depend on a preponderance of the evidence, but instead depends on a fair probability on which a reasonably prudent person would act." *Id.* (quoting *Robinson v. State*, 451 Md. 94, 109 (2017)). Consequently, for a search warrant to be based on probable cause, "the affidavit in support of [the] search warrant, viewed in its totality, need only provide 'a fair probability that contraband or evidence of a crime will be found in a

particular place.'" *Stevenson v. State*, 455 Md. 709, 723 (2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Moreover, because reasonable minds may differ on the question of probable cause, a magistrate's determination that a particular affidavit established probable cause to justify a search is afforded great deference. *Id.* "So long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* at 723-24 (quoting *Gates*, 462 U.S. at 236) (cleaned up). "The substantial basis test does not require 'direct evidence that the evidence sought would be found in the place to be searched.'" *Whittington v. State*, 474 Md. 1, 32 (2021) (quoting *Stevenson*, 455 Md. at 724). Rather, a substantial basis "may be predicated on an affiant's professional experience and inferences drawn therefrom in deciding whether probable cause exists." *Id.*

The Fourth Amendment's particularity requirement, on the other hand, "protects against general and overbroad warrants that leave the scope of the search to the discretion of law enforcement." *Richardson v. State*, 481 Md. 423, 450 (2022). "[T]he particularity requirement prevents 'general searches' by limiting the authorization to search 'to the specific areas and things for which there is probable cause to search.'" *Eusebio*, 245 Md. App. at 25-26 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). "The particularity requirement 'ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" *Peters v. State*, 224 Md. App. 306, 342-43 (2015) (quoting *Garrison*, 480 U.S. at 84). To meet those ends, a warrant's description of the places to be searched must be

13

"'definite enough to prevent any unauthorized and unnecessary invasion' of privacy rights." *Eusebio*, 245 Md. App. at 26 (quoting *Moats v. State*, 455 Md. 682, 708 (2017)). In addition, "[t]he description must be 'such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended.'" *Id.* (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)).

Against that backdrop, we hold that the geofence warrant in the instant case was based on probable cause and was sufficiently particular. Regarding probable cause, the warrant application established the following relevant facts: that the Frederick Road property was a vacant, twelve-acre farm in a rural area; that, on April 11, 2020, farm equipment and other items had been reported missing from the Frederick Road property; that a family member had gone to the property on April 4, 2020, and observed that the missing items were still there; that the property owner had gone to the property on April 11, 2020, and observed that the missing items had been taken; that the property was private and had "no trespassing" signs posted; and that a witness had observed an unidentified individual hauling a piece of farm equipment away from the property at some point between April 3 and April 5, 2020. The warrant application also established that Google stored identifying information, including names and addresses, of Google account holders; that Google also collected historical location data on Google account holders via the account holder's mobile device; that such data was likely to reveal the geographic location of the account user at a particular time; and that, if such data showed that a mobile device was in the area of the Frederick Road property during the relevant time frame, Google would likely have a name and address associated with that device. From those facts, a fair

probability existed that a crime—the theft of the farm equipment—had taken place at the Frederick Road property at some point between April 3 and April 11, 2020. In addition, a fair probability existed that Google would have location data and identifying information for the perpetrator or perpetrators. As such, the issuing judge had a substantial basis for concluding that a search of Google's records would uncover evidence of a crime.

As to the warrant's particularity, the scope of the search—location data for mobile devices that showed activity within a 100-meter radius of the main residence of the Frederick Road property between April 3 and April 11, 2020—was precise and was in no sense "overbroad" or "wide-ranging" when considered in conjunction with the circumstances of the crime. As noted, the police had probable cause to believe that farm equipment was stolen from the Frederick Road property at some point during that time period, and the police had probable cause to believe that the perpetrator's identity was stored in Google's records via his location data. The search parameters were therefore carefully tailored to the search's justifications.

Moreover, the property was a vacant, twelve-acre farm in a rural area, and the property's main residence could be accessed by a driveway that ran from the main residence to a nearby public road. The driveway was approximately 100 meters long, and the entranceway appears to be the closest point at which the presumptive property line ends. Therefore, by limiting the search area to within a 100-meter radius of the main residence, the police virtually ensured that any cell phone activity that met the search's parameters would have had to come from within the property's boundaries. Given that the property was privately owned and included "no trespassing" signs, and given that the

property owner had claimed that no family member had been to the property between April 4 and April 11, 2020, the chance that the search would result in any unauthorized or unnecessary invasion of privacy rights was almost non-existent. That is, even if the search revealed the cell phone activity of someone who was not involved in the theft, that person would likely have been trespassing on private land.

To be sure, there was nothing in the warrant application to indicate that the suspect was in possession of a cell phone at the time of the crime. We do not find, however, that the omission of such an averment is of any consequence to our probable cause or particularity analysis. It is undisputed that cell phones have become an integral part of everyday life. *See Riley v. California*, 573 U.S. 373, 385 (2014) (noting that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of the human anatomy"). It is equally undisputed that many, if not most, people carry a cell phone virtually all of the time. *See Carpenter v. U.S.*, 585 U.S. 296, 311 (2018) (holding that historical cell-site records presented significant privacy concerns because, in part, individuals "compulsively carry cell phones with them all the time"). Thus, while there was no direct evidence that the perpetrator in this case had a cell phone or that one was used in relation to the crime, it was reasonable for the issuing judge to infer that the perpetrator was in possession of a cell phone during the commission of the crime and that, consequently, Google had location data and identifying information about that person.[3] *See State v. Cabral*, 159 Md. App.

---

[3] Regarding the relationship between the use of an Android-enabled (or similar) device and the instant crime, although we do not find the lack of such an averment fatal to

16

354, 380 (2004) ("[F]or purposes of the probable cause analysis, we are concerned with probability, not certainty.").

We are likewise unmoved by the fact that none of the averments in the warrant related to a particular suspect. Neither the probable cause requirement nor the particularity requirement demand that a search be linked to any one person. As the State correctly notes, a search warrant is an investigative tool, and a valid search warrant may be issued before the police have identified a suspect. So long as the warrant application provides a fair probability that evidence will be found in the place being searched, and so long as the warrant itself is definite enough to ensure that the police can identify the place being searched and conduct the search without any unauthorized or unnecessary invasion of privacy rights, then the probable cause and particularity requirements have been met.

As Tomanek recognizes, and as we have discovered, there are very few cases, in which courts in other jurisdictions have analyzed the Fourth Amendment's probable cause and particularity requirements in the context of a geofence warrant. A comprehensive summary of federal caselaw is found in *United States v. Rhine*, 652 F. Supp. 3d 38, 73-89. (D.D.C. 2023). While each of the cases contains a variety of distinguishing facts, the analyses are virtually identical, and, not surprisingly, consistent with the well-settled rule of law that search warrants be supported by probable cause and particularity.

In *Rhine*, the court held that a geofence warrant, which authorized the seizure of location data collected from smartphones of individuals in, and immediately around, the

---

the warrant in the instant case, affiants would be wise to include such information in future warrant applications.

17

Capitol building, between 2:00 p.m. and 6:30 p.m. on January 6, 2021, was not constitutionally overbroad, and satisfied the Fourth Amendment's particularity requirement, because there was more than a fair probability that suspects within the geofence area were carrying smartphones, the warrant sought subscriber information only from those devices for which at least a record was located within the geofence, and the geofence area closely contoured the Capitol building itself. *Rhine*, 652 F. Supp. 3d at 81-89. Recently, in *United States v. Easterday*, No. CR 22-404 (JEB), 2024 WL 195828 (D.D.C. 2024), the court examined virtually the same facts and reached the same conclusion as it had in *Rhine*. In *United States v. Chatrie*, 590 F. Supp. 3d 901 (E.D. Va. 2022), the court held that a geofence warrant that covered a 70,686 square meter radius, over a span of one hour, in a busy metro area, lacked particularized probable cause to search every mobile device user within the geofence because there was no suggestion of likelihood that those searched were involved in the crime (bank robbery) and that the large radius unnecessarily risked searching individuals who "may not have been *remotely* close enough" to participate in or witness the crime. *Chatrie*, 590 F. Supp. 3d at 929-31. In these cases, as in the instant case, the warrant applications each contained a multi-step process that required an additional warrant to obtain deanonymized or identifying information. *Rhine*, 652 F. Supp. 3d at 66; *Easterday*, 2024 WL 195828 at *2; *Chatrie*, 590 F. Supp. 3d at 918-19. In *Chatrie*, however, the steps were substantially different from those in the warrant at issue here, in *Rhine*, and in *Easterday*. Most notably, the *Chatrie* application contained provisions that would *expand* the geographical area *and* the time frame of the search. *Chatrie*, 590 F. Supp. 3d at 919. Finally, the *Rhine, Easterday, and Chatrie* courts

18

each held that, even if the geofence warrant violated the Fourth Amendment, the good faith exception to the exclusionary rule would apply. *Rhine*, 652 F. Supp. 3d at 89-90; *Easterday*, ---F. Supp. 3d---, 2024 WL 195828 at 6-7; *Chatrie*, 590 F. Supp. 3d at 937-41.

Tomanek relies on *In the Matter of the Search of Information that is Stored at the Premises Controlled by Google, LLC*, 542 F. Supp. 3d 1153 (D. Kan. 2021) ("*Kansas*"), as being "akin" to the instant case. In *Kansas*, the United States District Court for the District of Kansas found that a geofence warrant that sought location data from a public area, over a one-hour period, lacked sufficient particularity and probable cause. *Id.* at 1155-1156. In reaching that conclusion, the District Court found that the warrant application lacked probable cause because the application did not suggest that the perpetrator or a witness had a cell phone. *Id.* at 1157. The District Court found that the warrant application also lacked particularity because the geofence boundary included two public streets, thereby raising privacy concerns, and because the nexus between the crime and the one-hour period was "weak." *Id.* at 1158.

*Kansas* is distinguishable from the circumstances here. Here, we do not consider the warrant application to be lacking in probable cause due to its failure to set forth any averment suggesting that the perpetrator had a cell phone. As discussed, we are of the opinion that the issuing magistrate could reasonably infer that the perpetrator had a cell phone even without such an averment. In addition, we are not faced with the same concerns regarding particularity that the court faced in *Kansas*. The area being searched here was a private, vacant farm, and the likelihood that an "innocent" person's privacy rights would be violated by the search was remote. Also, while the time period at issue here—

19

approximately one week—is considerably longer than the one-hour period at issue in *Kansas*, the nexus between the crime and the time period in the instant case was strong.

In sum, we hold that the geofence warrant in the instant case met the basic requirements of the Fourth Amendment. Accordingly, the circuit court did not err in denying Tomanek's motion to suppress on those grounds.[4]

We caution that this holding is limited to the unique facts before us. Because geofence warrants have an inherent potential for seizure of a profusion of personal device data, issuing courts *must remain vigilant in enforcing the underlying probable-cause and particularity requirements of geofence warrants.* Haley Amster & Brett Diehl, *Against Geofences*, 74 STNLR 385 (2022). Although a multi-step process may aid in narrowing the scope of a geofence warrant, it does *not automatically create a search that is acceptable under the Fourth Amendment. Id.* For example*, courts should be skeptical of discretionary selective expansion, where law enforcement returns to and negotiates with Google instead of a magistrate to seek an expanded search. Id.* Additionally, courts should exercise great prudence in evaluating geofence warrants for heavily populated or congested areas, which have the potential to capture an enormous amount of data from individuals unassociated with the crime. *Rhine*, 652 F. Supp. 3d at 75-77, (citing *In re Search of Info. Stored at Premises Controlled by Google,* No. 20 M 297, 2020 WL 5491763 (N.D. Ill. July 8, 2020) (Weisman, Mag. J.) and *In re Search of: Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730, 733 (N.D. Ill. 2020) (Fuentes, Mag. J.)).

---

[4] This case was briefed, argued, and decided under the Fourth Amendment; we did not consider Article 26 of the Maryland Declaration of Rights.

**B.**

Assuming, *arguendo*, that the warrant was invalid, Tomanek would nevertheless not be entitled to the remedy he seeks, *i.e.*, suppression, because the police were acting in "good faith" in executing the geofence warrant. Although evidence obtained in violation of the Fourth Amendment should generally be excluded, there are exceptions to that rule, and one of those exceptions is the "good faith doctrine." *Richardson v. State*, 481 Md. 423, 446 (2022). Under that doctrine, "evidence will not be suppressed under the exclusionary rule if the officers who obtained it acted in objectively reasonable reliance on a search warrant." *Id.* As the United States Supreme Court has explained, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *United States v. Leon*, 468 U.S. 897, 922 (1984). In fact, there are only four circumstances in which a police officer's reliance on a search warrant would not be considered reasonable under the good faith exception:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless regard for the truth;
>
> (2) the magistrate wholly abandoned his detached and neutral judicial role;
>
> (3) the warrant was based on an affidavit so lacking in probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

*Patterson v. State*, 401 Md. 76, 104 (2007) (quoting *Leon*, 468 U.S. at 923).

21

None of the above circumstances were present here. There is nothing in the record to suggest that the issuing magistrate was misled or that the magistrate abandoned his detached and neutral judicial role. And, as discussed in greater detail in Part A, we are convinced that the warrant and accompanying affidavit contained sufficient probable cause and particularity. Given the points raised in that discussion, we cannot say that the warrant was so lacking in probable cause as to render belief in its existence unreasonable. *See Marshall v. State*, 415 Md. 399, 409-10 (2010) ("[T]he standard of factual support required to be presented by the affidavit in order for evidence to be admitted under the good faith exception is considerably lower than the standard for establishing a substantial basis for a finding of probable cause by a judge issuing a search warrant."). Nor can we say that the warrant was so facially deficient in its particularity that the executing officers could not have reasonably presumed the warrant to be valid. *See Patterson*, 401 Md. at 110 (noting that a warrant is facially deficient when it "fails to 'particularize the place to be searched or the things to be seized'") (quoting *Leon*, 468 U.S. at 923). Consequently, the police were acting in "good faith" in executing the warrant, such that suppression of the evidence derived therefrom would not be appropriate.

As noted, the State argues that the exclusionary rule should not apply for the additional reason that the discovery of the evidence Tomanek sought to suppress was too attenuated from the allegedly unlawful geofence warrant. Because we hold that the good faith exception precludes suppression, we need not address the State's alternative argument.

## II.

Tomanek's other claim is that he was entitled to a suppression of the evidence obtained as a result of the Shaffersville Road warrants because the police used "excessive force" in serving the first Shaffersville Road warrant. He argues that the tactics used by the officers in executing the warrant were unreasonable under the circumstances and that his act of shooting at the officers' vehicle was a direct response to that illegality.

The State contends that Tomanek has not alleged a cognizable Fourth Amendment claim because he was not subjected to any search or seizure when he fired the shots. The State contends further that the police acted reasonably prior to the shooting.

We hold that the suppression court did not err in rejecting Tomanek's excessive force claim and denying his motion to suppress on that ground. Assuming without deciding that the disputed actions in the instant case could trigger the Fourth Amendment's exclusionary rule, there is absolutely no support in the record for Tomanek's claim that the police used excessive force or otherwise acted unreasonably prior to the shooting. The facts adduced at the suppression hearing established that, on the day of the search, officers went to Tomanek's residence to execute a search warrant, that the officers were in a tactical vehicle at the time, and that, when the officers' tactical vehicle got within fifty yards of Tomanek's residence, he fired at the vehicle. There was no evidence that the officers displayed *any* force or attempted to seize Tomanek.[5] In fact, there was no evidence that Tomanek was cognizant of the officers' presence or that he started shooting in response to

---

[5] For this and other reasons, Tomanek's reliance on *People v. Cantor*, 36 N.Y.2d 106 (1975), is misplaced.

23

any display of force. According to Officer Funk's testimony, which was undisputed, it was dark when the shooting occurred, the tactical vehicle was unlit and had no visible weapons, and Tomanek would have been unable to see inside of the vehicle. The only reasonable inference that could be drawn from that evidence was that Tomanek saw a vehicle approaching his residence, and he shot at it. Nothing about those circumstances, aside from Tomanek's own actions, could be considered "excessive" or "unreasonable."

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**